**AFFIRM; and Opinion Filed August 21, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

### No. 05-14-00686-CV
_____

## IN RE A.W. AND J.W., CHILDREN

**On Appeal from the 304th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 12-01084-W**

## OPINION

Before Justices Moseley, O'Neill, and FitzGerald
Opinion by Justice O'Neill

A jury terminated the parental rights of Laura Traylor ("Mother"). On appeal, Mother argues the evidence is legally and factually insufficient to support the jury's finding that termination is in the best interest of her two children. We affirm the trial court's judgment.

### Background

Mother's daughter, A.W., was born on August 7, 2002, and her son, J.W., was born on February 13, 2004.[1] Jimmy Walker was the children's father. Father has an extensive criminal record. He has been convicted four times for assault bodily injury against women, two of which were against Mother, evading arrest, theft, and interfering with an emergency call. The dates of

_____

[1] At the time of trial, A.W. was approximately eleven-years-old and J.W. was ten-years-old.

these offenses range from 1987 to 2004.  The record also indicates Father is a registered sex offender.[2]

Mother was convicted in 1999 for forgery by possession of a check with intent to pass. She also spent 180 days in jail for possession of methamphetamine in 2009.

Prior to the August 1, 2012 incident that started the removal process in this case, Father served seven years in jail for injury to a child.  In that case, Father engaged in a physical altercation with Mother's older son, who was not Father's biological son.

On August 1, 2012, eight months after Father's release from jail for his injury to a child conviction, Officer Daniel Malouf received a "call-out" to a duplex that started as a 911 hang up. Before Officer Malouf reached the duplex, he encountered a young girl running from the duplex asking for help.  Officer Malouf then observed Father walk out of the house, say "Oh, shit," and walk back inside.

Mother and J.W. came out of the house, and Mother showed Officer Malouf where Father bit her and hit her face.  Mother explained the disagreement started over Father's discipline of J.W., which escalated into a verbal argument.  When Mother tried to call the police, Father slapped her and hit the phone out of her hand.  J.W. reported Father scratched and kicked him in the stomach during the argument.  Officer Malouf arrested Father.

An affidavit filed on September 28, 2012 by Kamesha Hughes, a caseworker with Dallas County Child Protective Services ("CPS"), stated Mother "believes her daughter blew things out of proportion by calling the police on August 1, 2012."  Mother also stated she did not believe Father kicked J.W. because "she looked at his stomach and didn't see any bruises," and her son "has a habit of lying . . . and will sometimes 'act retarded' and is sometimes difficult to handle."

---

[2] Father was sixteen at the time of the offense, and the complainant was a twelve-year-old girl.  Mother testified Father was dating the girl at the time of the charges.

On September 28, 2012, CPS filed its original petition for protection of A.W. and J.W. and for termination of parental rights as to both Mother and Father. Prior to Mother's jury trial, Father voluntarily relinquished his parental rights to both children, despite Mother's initial pleas for him not to do so.

Mother's case then proceeded to trial in February 2014. After hearing evidence from numerous witnesses, including Mother, the jury determined Mother violated sections 161.001(1)(D), (E), and (O) as to both children. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (O) (West 2014). The jury also found that termination was in the best interest of both children. TEX. FAM. CODE ANN. § 161.001(2) (West 2014). This appeal followed.

## Standard of Review

A trial court may terminate the parent-child relationship if the fact-finder determines (1) a parent committed one or more of the enumerated statutory acts in section 161.001(1) of the family code, and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. §161.001(1), (2) (West 2014). Both elements must be established; termination may not be based solely on the best interest of the child. *In re M.C.T.*, 250 S.W.3d 161, 168 (Tex. App.—Fort Worth 2008, no pet.).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence. TEX. FAM. CODE ANN. §161.001. "Clear and convincing evidence" is the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *See In re M.V.*, 343 S.W.3d 543, 546 (Tex. App.—Dallas 2011, no pet.).

On appeal, we apply a standard of review that reflects this burden of proof. *Id.* When reviewing the legal sufficiency of the evidence, we consider all of the evidence in the light most

favorable to the finding to determine whether the fact-finder could reasonably have formed a firm belief or conviction the finding was true. *Id.* In doing so, we assume the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could and disregard all evidence that a reasonable fact-finder could have disbelieved or found to be incredible. *Id.*

In conducting a factual sufficiency review, we must give due deference to any evidence the fact-finder could reasonably have found to be clear and convincing. *Id.*; *see also In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We consider whether the disputed evidence is such that a reasonable fact-finder could not have resolved the disputed evidence in favor of its finding. *In re M.V.*, 343 S.W.3d at 546. If the disputed evidence is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

When deciding whether termination is in the best interest of a child, the following factors are considered: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by those individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive, and some factors may be inapplicable to some cases. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, presence of scant evidence relevant to each factor will not support such a finding. *Id.* On

–4–

appeal, Mother focuses exclusively on the first six *Holley* factors. However, because the record provides relevant evidence regarding the remaining factors, we shall consider them in our analysis.

**Application of the *Holley* Factors**

A.  The Desires of the Children

The children did not testify at trial. The initial psychological assessment conducted by Dr. Rhonda Polakoff, eight months after A.W. entered foster care, stated A.W. liked living in the current foster home and enjoyed the structure and stability. However, she also thought she would only be living in foster care for one year and would be reunited with Mother. There was evidence this belief came from Mother, who told the children during some visits that they would be reunited. CPS told Mother to stop telling the children anything about future plans because mixed signals from Mother and the caseworkers could be harmful. Mother, however, did not see her actions as problematic because, "I'm their mother. The mother is always right."

Mother testified J.W. cried at the end of every visit and said he wanted to go home. However, Mother also testified he had become distant towards her since he entered foster care. J.W.'s initial psychological assessment conducted eight months after entering foster care stated he did not like being in foster care and greatly missed Mother. However, he stated he was glad he was going to spend the summer in the foster home because he knew he would have fun.

Sometime between the psychiatric evaluation and the time of trial, J.W. was moved to a second foster home. The CASA volunteer assigned to the children testified that a week before trial, J.W. expressed happiness in his current foster home and did not mention Mother.

Thus, the evidence indicates that while both children missed Mother and at times expressed a desire to return to her, they also recognized and appreciated the stability and structure they received from their foster homes. *See, e.g., Jones v. Tex. Dep't of Family &*

–5–

*Protective Serv*s., No. 03-07-00727-CV, 2009 WL 1563544, at \*9 (Tex. App.—Austin June 4, 2009, no pet.) (mem. op.) (evidence legally and factually sufficient to support finding that termination was in the children's best interest because mother had not shown the ability to be a safe and stable parent even though children expressed love and desire to be reunited with mother).

B.      The Emotional and Physical Danger to the Children Now and in the Future

Although the record is clear Mother never abused the children, which is a fact she emphasizes on appeal, she allowed their continued exposure to Father's domestic abuse against her, which is a huge factor she ignores. When asked about her relationship with Father, Mother minimized his abuse towards her by saying it only happened twice, that everyone argues, and she did not feel the level of anger or violence present in the home was harmful to anyone. But, she also admitted to calling the police at least twenty times for Father's behavior, and Father was convicted multiple times for assault against her and other women.

Mother testified Father was a good dad, that he never neglected the children, and if it was up to her, she would allow Father to see the children. In two separate instances, Mother sided with the abusive Father and did not believe her own sons' accusations against him. In fact, she called J.W. "a little drama king" and accused him of lying and "act[ing] retarded." Moreover, she said A.W. blew things out of proportion by calling the police on August 1. Such testimony indicates an inability or lack of desire to protect her children both physically and emotionally.

While Mother agreed it was not healthy for anyone to be in an ongoing domestic violence relationship, she admitted to staying in the violent relationship for fifteen years and believed it was okay because she was the one getting hit, not the children. She testified she did not believe the children were ever in danger, and when asked what she thought "endangerment" meant, she answered, "Like my children getting beat everyday . . . there's people that are - - that are far

–6–

worse than what my children have been through." However, she admitted that just because others had been through worse, her situation was not okay.

She also admitted she would allow Father to see the children in the future if the children decided they wanted to see him. She testified she believed the only mistake she made was letting him back into their lives after his release from jail and allowing Father to see the children on August 1. She regretted that decision every day, but she wanted J.W. to have an opportunity to know his father. J.W., however, stated in his psychological evaluation he regularly had bad thoughts about Father and had no desire to see him. J.W. was fearful of Father and at times, J.W. was even scared Father would kill Mother.

Despite Mother's completion of parenting classes, Kendra Williams-Harris, a CPS specialist assigned to the children's case, did not believe Mother had changed her attitude towards Father and keeping the children away from danger. "There's history." In fact, Williams-Harris stated Father testified during his termination hearing the only reason he and Mother were not together was because of this case.

Shundria Riddick, a licensed counselor, testified regarding her therapy sessions with Mother. She explained she uses cognitive behavioral therapy, which tries to address the person's thinking to change behavior. Riddick wanted to help Mother with her approach to parenting and relationships. Riddick testified Mother stopped coming to the sessions and did not make any progress during the four sessions she attended. Mother seemed to never understand that allowing Father to hit her was harmful to the children. Mother's continued desire to communicate with Father also indicated to Riddick that Mother was not attempting to change any of her behavior or understanding of the domestic situation. Riddick felt Mother was very resistant during their counseling sessions, and she described Mother as not receiving criticism favorably.

–7–

Thus, the evidence establishes a likelihood Mother would not protect her children from Father and his abusive tendencies. She had done little to try and change her belief about the cycle of domestic abuse she was experiencing, and her children expressed fear about Father returning to their lives.

### C. The Emotional and Physical Needs of the Children Now and in the Future

The evidence shows the children have been impacted by their past living conditions. The jury heard evidence of Mother's and the children's homelessness. While Mother testified she was "only homeless three times since 2008," A.W. reported at least five occasions and said she could name every homeless shelter in Dallas County. A.W. also said although she got used to it, she was embarrassed living in shelters and did not feel safe.

A.W. began taking medication while in foster care that helped her with concentration, and she also started wearing glasses. Both impacted her school work positively.

A.W. was described by Dr. Polakoff as "a sweet-spirited child who is motivated to do well; however, she is expending a great deal of her cognitive energy and life force protecting herself from her own emotional pain." The history of "severe trauma and instability has contributed to her high needs for control and her inability to cope with these painful feelings."

J.W. was described with "significant emotional and behavioral issues" and was "quick to anger and [ ] very anxious and sad." He was failing all of his classes when he entered his first foster home.

The evidence shows both children desire stability and continue to work through anger, insecurity, and anxiety caused by their past family experiences. The jury heard testimony that A.W. and J.W. improved while in their foster homes. Both children's grades increased, and they seemed to exhibit some level of trust in their foster parents. They both also made improvements while taking medication.

Mother, on the other hand, did not believe homelessness was harmful to her children, but rather she believed she helped the situation by staying in a shelter. While her decision was likely better than living on the streets, Mother did not seem to grasp the impact these experiences had on A.W. She also did not view the time she moved the children between family, friends, and shelters as chaotic. Moreover, she testified "everybody has CPS in their life every now and then."

There was also evidence indicating Mother may not have been giving J.W. his medication correctly. When J.W. first went to his foster home, all of his medications, which included ninety to one hundred pills of different colors, were in one container. While Mother explained the pills were all the same but came from different pharmacies, the jury was free to disbelieve her explanation.

Thus, the evidence indicates the children's emotional and physical needs were being met while in foster care and would likely continue to be met; whereas, Mother neither seemed to grasp the impact of the domestic violence and past homelessness on her children, nor did she show meaningful changes in her perception of the situations to provide for her children's needs. *See, e.g., Jones*, 2009 WL 1563544, at *9 (considering mother's downplay of the problems facing the children in the best interest analysis).

> D. The Programs Available to Assist the Individuals to Promote the Children's Best Interest

Mother did not take full advantage of the programs available to assist her. While she completed her parenting classes, she did not complete her individual counseling or her Batterer's Prevention Intervention Program. The only program Mother relies on for assistance is Metro Care; however, the record is devoid of any information as to how long Mother will be allowed to receive assistance from the program. At the time of trial, Mother lived in a duplex she received

through Metro Care. Metro Care also helped her stay medication compliant by providing her bipolar medication.

### E. The Parental Abilities of the Individuals Seeking Custody

The record does not provide any detailed information about the specific parental abilities of the foster families taking care of the children. However, the evidence indicates A.W. and J.W. were eating better, doing better in school, taking their medication regularly, participating in church, and enjoying the stability the homes provided.

As detailed above, Mother did not seem to realize the impact the domestic violence had on her children. She minimized Father's behaviors and also testified she did not believe her sons when they told authorities Father hit them. These actions indicate Mother did not always put her children's needs before her own or before her feelings towards Father.

Mother did not complete all her court-ordered services, including Batterer's Prevention Intervention Program and counseling, but she completed her parenting classes. However, the testimony from the counselors who interacted with Mother did little to show the sessions Mother attended helped her parenting ability. Jeffery Napier, a licensed psychologist, conducted an evaluation of Mother. He learned about Mother's past encounters with abusive men. He testified the history with abusive men was significant because it showed a lack of protectiveness for the children. He also opined, "Depression may compromise her engagement, consistency, and exercise of authority relative to her parenting role . . . she may occasionally lack the energy to sustain her vigilance of the children should she continue to avail herself to an abusive relationship with [Father]." He further stated he tended to see past behavior as the best predictor of future behavior, unless something in the present was changing, which in this case, it was not changing. Mother admitted during her interview that CPS had investigated her approximately

ten times.  And as detailed above, Shundria Riddick wanted to help Mother with her approach to parenting and relationships, but Mother was resistant.

While the above testimony raises questions about Mother's ability to parent her children, the jury heard some positive evidence about Mother's ability to provide.  When she had the children, she described how she got them ready for school and made sure she was home upon their return.  If she was not going to be home, she made arrangements for someone to be there.  They took weekly outings to the park or to dinner.  They used food stamps for food.  She provided clothing.  Each child had their own room, bed, closets, and toys at the duplex.  She had lived in her current residence for two years and hoped the children returned to it.  She explained that if she lost her housing assistance from Metro Care, she could establish a home on her own with her income because she could get an all-bills-paid apartment.

Thus, Mother has shown some ability to provide for her children's basic needs of food and shelter.  However, as detailed, the jury heard extensive evidence of her inability to provide the emotional stability and protection A.W. and J.W. need because of Mother's minimization of Father's abuse towards her.  *See In re J.D.B*., No. 05-14-00037-CV, ___ S.W.3d ___, 2014 WL 2735670, at *14 (Tex. App.—Dallas June 17, 2014, no pet.).

F.     Plans for the Children by the Individual or Agency Seeking Custody

Mother did not testify to any specific future plans for the children other than wanting to bring them back to her current residence.

CPS acknowledged that although A.W. and J.W originally lived in the same foster home, J.W. needed to be placed in a "therapeutic foster home," which is a home that cares for children with more emotional issues.  The jury heard the siblings are quite attached to each other and while separation may be difficult and not ideal, the foster mothers have worked together so the children see each other more than once a month, including some overnight and weekend stays.

–11–

While CPS has talked to the foster parents about adoption, "there has not been a definite decision because they don't know which way this case is going to go."

G.     Stability of the Home or Proposed Placement

While Mother's current housing situation appears to be stable, there was no evidence presented as to how long she can receive services from Metro Care. Further, as repeatedly stated, Mother's ability to provide the emotional stability the children need is not well-supported by the record. As Mother's therapist opined, past behavior tends to be the best predictor of future behavior, and Mother's attitudes have not changed.

As to the foster homes, J.W. lives in a home with six boys, ranging in age and experiencing different problems. However, the children's CASA volunteer testified he believed J.W. was receiving the structured home environment he needed. As for A.W., the CASA volunteer testified she interacted well with her foster parent. He believed the home was safe, and A.W. felt comfortable and secure.

Williams-Harris also testified A.W. is receiving stability in the foster home, ongoing intensive individual counseling, and psychiatric consults. She is participating in appropriate extracurricular activities both in and outside of school.

H.     Acts or Omissions of the Parent Indicating the Existing Parent-Child
       Relationship is not Proper

We will not repeat the acts and omissions on Mother's part regarding her decisions to expose her children to an abusive Father, as they have been thoroughly discussed. However, the jury heard additional evidence of other acts and omissions indicating the parent-child relationship is not proper.

Mother admitted to drug use in the past, but testified she has been clean since 2009. Her drug of choice was methamphetamine; however, she also used marijuana and tried crack cocaine. Despite her denial of any recent drug use, she admitted to skipping a drug test within the past

–12–

two months. Williams-Harris testified Mother missed four required drug test, one as recent as seven days before trial. The past three years have been her longest period of sobriety, but she has never received drug treatment. She simply stopped using drugs. Mother testified she knew the court and CPS considered a missed drug test as a positive result for an illegal drug.

Mother did not listen to CPS when case workers told her not to give the children false hopes about reunification during her visits because it made the situation harder on the children. Rather, Mother did not see her behavior as harmful because, "I'm their mother. The mother is always right."

Mother admitted to missing "quite a few" visits with the children. The jury later heard testimony she missed about twelve visits, which included times the children showed up because Mother failed to call ahead of time and tell CPS she was not coming.

I.      Any Excuse for the Acts or Omissions of the Parent

Mother did not believe the children's domestic situation was harmful because Father abused her, not the children. She also expressed her belief that others lived in worse situations, and it was normal for CPS to be a part of a family's life.

Mother explained she missed her most recent drug test because the weather was bad, and she did not have money for public transportation to get to the testing facility.

Mother admitted she was unemployed during the time they lived in homeless shelters because she was trying to qualify for disability. Mother received injuries nine years earlier when A.W. ran over her with a car. Mother stepped away from the car "for just a second," leaving both children in the car, and A.W. knocked the car into gear. A.W. was about four-years-old and J.W. was two-years-old when the incident occurred. Because of her injuries, Mother has been unemployed since 2008. Although she admitted she could do work that did not require walking,

she decided to accept disability rather than try to obtain employment. She currently receives $712 a month for disability.

## Conclusion

After considering the *Holley* factors and the evidence in the light most favorable to the verdict, we conclude the jury could reasonably have found by clear and convincing evidence that termination of Mother's parental rights was in A.W.'s and J.W's best interest.

Although the jury heard evidence that Mother has lived in the same duplex for the past two years and the children have been placed in separate foster homes, which is not ideal and weighs in favor of the children's best interest being with Mother, the strong evidence of Mother's inability to recognize the damage her abusive relationship with Father caused the children must not be dismissed. Witnesses repeatedly testified the safety, security, and stability of A.W. and J.W. was not Mother's number one priority. The children have thrived in the stability of their foster homes. Thus, the disputed evidence is not so significant that the fact-finder could not reasonably have formed a firm belief or conviction that termination of Mother's parental rights was in the children's best interest.

Accordingly, the evidence is both legally and factually sufficient to support the jury's verdict. Mother's sole issue is overruled. We affirm the trial court's judgment.

/Michael J. O'Neill/
MICHAEL J. O'NEILL
JUSTICE

140686F.P05

–14–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN RE A.W. AND J.W., CHILDREN

No. 05-14-00686-CV

On Appeal from the 304th Judicial District Court, Dallas County, Texas
Trial Court Cause No. 12-01084-W.
Opinion delivered by Justice O'Neill.
Justices Moseley and FitzGerald participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that the State recover its costs of this appeal from Laura Traylor.

Judgment entered this 21st day of August, 2014.