**AFFIRMED; Opinion Filed March 16, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-01340-CV

### IN THE INTEREST OF A.E., A CHILD

**On Appeal from the 304th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 13-186-W**

## MEMORANDUM OPINION
Before Justices Bridges, Lang, and Evans
Opinion by Justice Lang

Following a jury trial, the trial court rendered judgment terminating Mother's rights to her daughter A.E. In a single issue on appeal, Mother contends the evidence is legally and factually insufficient to support the jury's finding that termination was in A.E.'s best interest. We affirm the trial court's judgment.

### I. BACKGROUND

Mother was born in 1971, began using drugs "when she was like 13," and had her first child at age "16 or 17." Six years later, Mother was convicted of burglary of habitation. After she was released from prison, Mother had two more children. Each child had different fathers, one of whom physically abused Mother, and both children tested positive for drugs at birth. Mother's parental rights to these three children were terminated in Florida before she moved to Texas in the early 2000s.

Between October 2003 and December 2004, Mother was arrested eight times for offenses ranging from prostitution to burglary of habitation, and she received sentences ranging from forty-five days in jail to four years in the penitentiary. In June 2008, she gave birth to A.E. She was single at the time but, shortly after A.E. was born, she married Husband. She met Husband while pregnant with A.E. and married him by proxy while he was in prison for violating parole. Although Husband was not A.E.'s biological father, he was named the father on A.E.'s birth certificate.

For about four years after she married Husband, as Husband was in and out of prison and jail, Mother held a steady job as a waitress and provided for A.E. In January 2013, however, shortly after Husband was released from jail again, Husband assaulted Mother. The next day, Mother was arrested for "evading arrest using a vehicle." A.E. was in the car with her, sitting in the back seat unrestrained, leading to Mother also being charged with "endangering a child." A.E. was released to Husband and was in his care when, in February 2013, the Texas Department of Family and Protective Services ["TDFPS"] received a report "alleging sexual abuse of [A.E.] by her mother."

TDFPS caseworker Jennifer Steel investigated the allegation and learned the allegation arose after Husband had left A.E. all day with a neighbor who did "not know [A.E.'s] or [Husband's] name." The police were called, but when A.E. was interviewed, she stated her "Hello Kitty" doll had touched her.[1]

Steel interviewed Husband, who admitted having a criminal record and being on parole since 2008. Husband also told Steel that he was drug tested regularly and had not "failed a test in 5 years." He agreed to an oral swab drug test during the interview and tested positive for cocaine. Because of concerns with Husband's drug use and Mother's incarceration, A.E. was

---

[1] The neighbor was not prosecuted and testimony was elicited at trial that A.E. did not exhibit "any sexually reactive behaviors."

removed from the home. When no "viable relatives were identified or reached for placement," A.E. was placed in foster care.

Caseworker Danita Walker-Banks was assigned to monitor the case during its pendency. Although Mother was convicted of the evading arrest charge and sentenced to three years in the penitentiary, Walker-Banks developed a family service plan with the goal of reunifying A.E. with Mother and Husband within the year.[2] Under the service plan, portions of which were subsequently incorporated into a court order, Mother was required to submit to a psychological evaluation, drug and alcohol assessment, and random drug testing. She was also required to attend parenting classes, participate in individual and domestic violence counseling, and follow any recommendations made by the service providers.

Over the next year, while in prison, Mother attended parenting and domestic violence classes and participated in "AA" and "NA." When she was released on parole in June 2014, she obtained an apartment and a job at a restaurant, began domestic violence counseling, submitted to the psychological evaluation and drug assessment required under the family service plan, and began visiting A.E. one hour each week as allowed by TDFPS. By then, however, A.E. was thriving in her foster home, and TDFPS had changed its goal from reunification to termination of Mother's rights and adoption of A.E. by her foster parents. TDFPS sought termination on three of the grounds enumerated in section 161.001(1) of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 161.001(1) (West 2014). Specifically, TDFPS alleged Mother:

---

[2] Under Texas Family Code section 263.401(a), if a suit affecting the parent-child relationship brought by TDFPS is not finalized within a year of the date the court appointed TDFPS as temporary managing conservator of the child, the case must be dismissed. *See* TEX. FAM. CODE ANN. § 263.401(a) (West 2014). The Code allows a 180-day extension, however, upon a finding of "extraordinary circumstances." *See id.* § 263.401(b). Here, the trial court granted an extension, in part, because Mother did not disclose Husband was not A.E.'s biological father until the one-year deadline approached. A.E.'s biological father, in prison during this time for robbery and possession of a controlled substance, subsequently relinquished his rights to A.E. Although DNA testing conclusively excluded Husband, who TDFPS characterized as A.E.'s "legal" father, as A.E.'s biological father, he entered into a mediated settlement agreement with TDFPS "stipulating" that his parental right should be terminated for failure to comply with court-ordered services. *See id.* § 161.001(1)(O).

–3–

•knowingly placed or allowed A.E. to remain in conditions or surroundings which endangered A.E.'s physical or emotional well-being;

•engaged in conduct or knowingly placed A.E. with persons who engaged in conduct which endangered A.E.'s physical or emotional well-being;

•failed to comply with a court order establishing the actions necessary for her to regain custody of A.E., who had been in TDFPS's temporary managing conservatorship for at least nine months as a result of abuse or neglect.

*See id.* § 161.001(1)(D), (E), (O).

At trial, held in August 2014, caseworker Steel testified regarding the circumstances leading to A.E.'s removal and placement in foster care. She also testified that, before A.E. went to the foster home, A.E. was given a shower and new clothes because she had "caked on dirt all over her body, . . . a really bad odor[,]" and was wearing clothes that were too big for her. According to Steele, A.E. was moved from the foster home to a youth shelter a week later and subsequently to a second foster home. Steel explained A.E. had a fear of males and had difficulty with the foster father and a young male child in the first home.

Dr. Greta Kerwin, a psychologist, assessed A.E. in 2013, shortly after A.E. came into foster care, and again in the spring of 2014. At the time of her first evaluation, A.E. did not know the alphabet or her birthday, could count only to seven, and "knew . . . [t]riangle and circle[, but] did not know a square." According to Dr. Kerwin, this was not "normal for a child her age." The evaluation also revealed A.E. suffered with anxiety, was "a little loose" on boundaries, and was aggressive at times. Dr. Kerwin recommended A.E. participate in play therapy "to work on improving boundaries, addressing her aggression, reducing her anxiety, and helping her process family circumstances." She also recommended A.E. be in an environment that offered stability, consistency, love, academic and intellectual stimulation, and encouragement.

–4–

When A.E. returned in May 2014 for a second assessment, she could count to 100, knew the alphabet, colors, and shapes, and was less anxious. Additionally, testing showed her verbal and non-verbal intelligence scores "jumped significantly," her "overall" intelligence scores "went from the lowest end of the average range to the upper limits of the above average range," and her "memory jumped from the average range to the very superior range." Dr. Kerwin attributed this to the stable environment A.E.'s foster parents provided and explained that children thrive in a stable, consistent environment because it "allows them to focus on their development versus trying to survive." She hoped that, "if family reunification [was] not an option," the foster parents would seek to adopt A.E. Although A.E. had made great strides, Dr. Kerwin felt that A.E. needed ongoing play therapy to help manage her anxiety, strengthen her coping skills, and eliminate her aggression. She also recommended social skills training and continued stability and consistency.

Licensed professional counselor Karla Hutcherson began counseling A.E. shortly after A.E. came into foster care. Hutcherson described A.E. as anxious and guarded when they first met. A.E. also showed signs of trauma, had a "flat affect," and was "socially behind." According to Hutcherson, A.E. expressed a fear of getting in cars and disclosed "issues about mom being asleep and she kind of had run of the home where she would be able to walk outside of the home." A.E. also reported seeing Husband choking Mother. Hutcherson addressed these issues with A.E. and felt A.E. had made significant progress. A.E. seemed happier, more secure, and more confident. Although counseling was beneficial, Hutcherson also attributed A.E.'s progress to the nurturing she received from her foster parents. She testified the foster parents worked well together and were very attentive. She also testified that the foster parents had two other children in the home, and this had helped A.E. with her social skills. Hutcherson testified A.E. had told her she wanted to stay in her foster home, and Hutcherson thought it was in A.E.'s

best interest to do so. She did not think Mother provided a safe environment for A.E., and observed that, although A.E. missed and loved Mother, she did not talk about Mother unless asked. Hutcherson further observed A.E. became anxious after each visit with Mother and, as a result, Hutcherson had to increase the frequency of counseling sessions with A.E.

David Lane, a licensed chemical dependency counselor, evaluated Mother in late June 2014. Mother admitted to him that she had "tried" marijuana at age seventeen, but she denied using any other drugs. Based on Mother's reportedly limited drug use, he did not diagnose substance abuse or dependency. He suggested, however, substance abuse education based on the information Mother gave him. Asked whether he was aware that two of Mother's older children had tested positive to drugs at birth, he responded that he was not.

Psychologist Mark Foster testified he also evaluated Mother in June 2014. He found Mother evasive at times and less than candid. For example, she did not mention she had an older daughter and also failed to tell him she did not raise her older children. Additionally, she presented herself as "very confident of her parenting abilities" and "felt she was an excellent parent." Test data, however, suggested she was impulsive, unable to tolerate frustrations, and narcissistic. Foster testified that a person with these characteristics "typically" is unlikely to permanently change her behavior, is "rarely" sincere about any changes, makes decisions based on emotions as opposed to reason, and has very little appreciation of how her behavior affects the child. This undermines the child's sense of security and is "emotionally detrimental" to the child. Based on the evaluation, Foster believed Mother could not provide a safe environment for A.E.

Caseworker Walker-Banks testified she considered Mother's prior history a serious concern, and she believed it provided "a road map for future risk." She observed Mother's visits with A.E. and thought the visits were generally appropriate, with time spent coloring, polishing

fingernails, reading, and playing. However, Walker-Banks feared A.E. would be in emotional and physical danger if returned home. Based on the information she received regarding the domestic violence, different boyfriends, and drug use, she believed Mother's parenting abilities were poor and Mother was unable to make good judgment calls on behalf of A.E. According to Walker-Banks, TDFPS was recommending termination so that A.E. could be safe and have stability and structure. Walker-Banks believed Mother's actions and behaviors in January 2013 as well as "before" supported termination on the grounds that Mother (1) had allowed A.E. to remain in dangerous conditions and (2) had engaged in conduct or placed A.E. with persons who engaged in conduct which endangered A.E. She also believed Mother's rights should be terminated for failure to comply with court-ordered services. She recognized Mother had completed many of the court-ordered services and had obtained a suitable apartment. She also acknowledged Mother had submitted to random drug testing and the results were negative. However, she testified "successful" completion of services required "true lifestyle changes" by the parent and a showing of insight into the issues that led to TDFPS's involvement. In Walker-Banks's opinion, adoption by A.E.'s foster parents following termination was in A.E.'s best interests because the foster parents had demonstrated the ability to provide a safe and caring environment for A.E. Their parenting abilities were "good" and they were able to meet A.E.'s educational and medical needs as evidenced by the progress A.E. had made since being placed in their home. Additionally, A.E. had expressed a desire to remain with her foster parents because of the stability they offered.

A.E.'s foster father described A.E. as lacking confidence, unable to interact with children, fearful of males, and overweight when she first came to his home. He and his wife worked with A.E. on these issues and saw much improvement. For example, they provided her structure, encouragement, and age-appropriate toys. This helped her academically and intellectually, and

as she progressed in those areas, her confidence built. They also worked with her pediatrician and a dietician to maintain her weight while her height "caught up." This allowed her body mass index to "even out." With respect to her fear of males, he "worked being around her gradually" and within three months, she was spending one-on-one time with him. He and his wife also began fostering a newborn baby boy and a two year old girl, and this helped A.E.'s social skills and to ease A.E.'s fears.

According to the foster father, A.E. had bonded with his wife and saw his wife as her mother. He described A.E. as imaginative, loving art, drawing, sculpting, and "doing things with her hands," and also loving to swim. He believed A.E. needed closure and testified he and his wife would begin the adoption process if Mother's rights were terminated. Asked whether he used the state subsidy he received as a foster parent, he replied he did not and that those funds were set aside for A.E.'s college education.

Mother admitted making mistakes and that her current situation with respect to her choice in partners and destructive actions was similar to her situation in Florida when her rights to her older children were terminated. However, she distinguished her current situation from the situation in Florida by noting that at the time her rights to her older children were terminated she was unemployed. Now, she was employed and financially able to provide for A.E. Additionally, she provided A.E. more than she did her older three children. Prior to A.E. being placed in foster care, Mother had A.E. in a private preschool, spent one-on-one time with A.E. swimming, coloring, drawing, and playing ball, took her to all her well-visits, and ensured she was properly vaccinated. Finally, she learned from counseling and the various classes she received in jail how to make better choices and other skills to use in difficult situations. She knew now not to stay in a violent relationship, that there were shelters that could assist her, and that she needed to make A.E. a priority and strengthen their relationship. She recognized living

with Husband was detrimental to A.E., and she was seeking a divorce from him. She also had the on-going support of the counselor she saw in jail and could call her when necessary. She asked the jury not to terminate her rights and testified her long-term plans for A.E. were to "continue to love her unconditionally," provide her a Catholic education, enroll her in extra-curricular activities, continue her in counseling if necessary, "push her toward her goals," and spend time with her. She did not think it would be difficult for A.E. to leave her foster home as A.E. loved her, told Mother she was ready to go home, and after telling Mother she was ready to go home, hugged her.

Christ Foundry United Methodist Mission pastor Owen Ross testified Mother began attending his church in July 2014 and "jumped in with both feet," volunteering in the bread ministry, attending the weekly women's Bible study group, and attending Sunday services. He found her committed to the church, committed to growing in faith, and committed to becoming a better person. He knew of some of Mother's "bad choices," including her lack of candor. He testified she explained she withheld information out of fear for A.E.'s well-being, and he talked with her about "turning that around."

Jessica Fernandez roomed with Mother shortly after A.E. was born and later leased an apartment to Mother. According to Fernandez, Mother always tended to A.E., did not let A.E. "run around," and loved A.E. "very much." She was aware of Mother's incarceration, but felt Mother had made a change. Mother began attending church regularly and realized her relationship with Husband was "bad." Fernandez testified Mother went "out of her way" to visit A.E., going after working a "graveyard shift" and with no sleep. Fernandez attended the visits with Mother and saw that Mother and A.E. were bonded. Fernandez noted A.E. repeatedly told Mother at visits that she loved and missed her, and Fernandez thought A.E. wanted to be with Mother.

Lesley Mohney, a therapist with Resolana, a program for women with trauma and addiction issues, testified Mother participated actively in the program while Mother was in jail. Mohney also testified she counseled Mother. She saw Mother's ability to manipulate, but over time saw her transition and accept responsibility for her actions. She believed Mother had acquired skills that would help her be a better parent and had seen her accessing them and utilizing them during conversations and interactions with her after she was released on parole. Asked whether she would be surprised to learn that Mother had been less than honest with the psychologist who evaluated her and the counselor who administered the drug assessment, Mohney responded she was disappointed, but not surprised. She explained the process of recovery "goes up and back and forward and down" and that certain stressors, such as the risk of losing your child, can "facilitate" lying.

Karen Robbins, a Court Appointed Special Advocate (CASA) supervisor, testified she was appointed as a "friend of the court" and had conducted her own investigation. Based on her visits with Mother, the foster parents, and A.E., she recommended Mother's rights be terminated. She explained that Mother's history of multiple incarcerations, abusive relationships, drugs, and "multiple issues" with her older children was an important consideration. Also important was the home environment Mother provided for A.E. A.E. witnessed Husband's abusive treatment of Mother and appeared to be developmentally delayed when she was placed in foster care. Robbins testified she was happy Mother no longer appeared to be using drugs and that she had gotten a job and an apartment. However, she was concerned Mother could not sustain that as "things become difficult in life." Looking at A.E.'s needs right now and in the future, Robbins thought it would be a "huge risk" to return A.E. to Mother to see if Mother could successfully meet those needs. Given A.E.'s "very strong" relationship with her foster parents, Robbins

–10–

thought the foster parents' plan to adopt A.E. if Mother's rights were terminated was in A.E.'s best interest.

The jury was instructed on the grounds alleged in support of termination and presented with a question of whether Mother's rights should be terminated in accordance with those instructions. The jury found they should. The jury also found termination was in A.E.'s best interest. The trial court subsequently rendered judgment incorporating the jury's verdict.

## II. LEGAL AND FACTUAL SUFFICIENCY

Mother does not challenge the finding that her rights should be terminated for committing one or more of the enumerated statutory acts or omissions. *See* TEX. FAM. CODE ANN. § 161.001(1). She challenges only the best interest finding. *See id.* § 161.001(2). Specifically, she asserts the evidence is insufficient to support that finding and that, given her testimony, a reasonable fact finder could not form a firm conviction or belief that termination of her rights was in A.E.'s best interest.

### *A. Applicable Law*

A parent's interest in maintaining custody of his child and raising the child is paramount and "far more precious than any property right." *See In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). Because a termination proceeding seeks to end that interest, a party moving to terminate the parent-child relationship must prove his case with clear and convincing evidence. *See In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also* TEX. FAM. CODE ANN. § 161.001. Under this heightened standard of proof, the party must offer evidence that "produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *J.F.C.*, 96 S.W.3d at 264.

The Texas Family Code permits the termination of parental rights upon a finding that (1) the parent committed one of the acts or omissions listed in section 161.001(1) of the code; and

(2) termination is in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001; *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). A strong presumption exists that the best interest of the child is served by keeping the child with his or her natural parent. *See In re E.A.F.*, 424 S.W.3d 742, 750 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (citations omitted). A presumption also exists that the prompt and permanent placement of the child in a safe environment is in the child's best interest. *Id.* (citing TEX. FAM. CODE ANN. § 263.307(a)). Additional factors that may be considered in determining a child's best interest when TDFPS is involved include:

(1) the child's desires;

(2) the child's age and emotional and physical needs now and in the future;

(3) any emotional and physical danger to the child now and in the future;

(4) the parenting abilities of the person seeking custody, including the ability to provide the child with adequate health and nutritional care, a safe home environment, and understand the child's needs and capabilities;

(5) the willingness and ability of the child's family to seek out, accept, and complete counseling services;

(6) the willingness and ability of the child's family to cooperate with and facilitate close supervision by an appropriate agency;

(7) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(8) the programs available to assist the person seeking custody to promote the best interest of the child;

(9) the plans for the child by the parent or agency seeking custody;

(10) the stability of the home or proposed placement;

(11) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper;

(12) any excuse for the parent's acts or omissions;

(13) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, and others who have access to the child's home;

(14) whether a history exists of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(15) whether a history exists of substance abuse by the child's family or others who have access to the child's home; and

(16) whether an adequate social support system consisting of extended family and friends is available to the child.

*See id.*; *see also* TEX. FAM. CODE ANN. § 263.307(b). These factors are not exhaustive, and the absence of some of these factors does not preclude a best interest finding, particularly if

undisputed evidence shows the parental relationship endangered the child's safety. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

*B. Standard of Review*

The heightened standard of proof at trial results in a heightened standard of review on appeal. *See In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). When reviewing the legal sufficiency of the evidence supporting a termination finding, an appellate court considers all the evidence in the light most favorable to the finding to determine whether the fact finder could reasonably have formed a firm belief or conviction the finding was true. *J.F.C.*, 96 S.W.3d at 266. In doing so, the appellate court must assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could and must disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. *Id.* If the court determines no reasonable fact finder could have formed a firm belief or conviction the finding is true, the court must conclude the evidence is legally insufficient. *Id.*

When reviewing the factual sufficiency of the evidence supporting a termination finding, an appellate court asks whether, in light of the entire record, the evidence is such that a factfinder could reasonably form a firm conviction about the truth of the State's allegations. *See A.B.*, 437 S.W.3d at 502-03. Further, the appellate court must consider whether the disputed evidence is such that a reasonable factfinder could not have reconciled that disputed evidence in favor of its finding. *See J.F.C.*, 96 S.W.3d at 266. If the disputed evidence is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.* Under both the legal and factual sufficiency standards, the appellate court must defer to the fact finder's determinations as to witness credibility. *See In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

–13–

*C. Application of Law to Facts*

Although Mother asserts the evidence is insufficient to support the best interest finding, she provides no analysis of the evidence adduced at trial in support of that finding. Instead, she relies exclusively on her testimony. Specifically, she relies on her testimony that she had a stable job, an apartment, and could provide for A.E.; she learned "a lot" from the classes and services she completed, including that she should put A.E. first and strengthen their relationship; her plans for A.E. were to provide A.E. a Catholic education, enroll A.E. in extracurricular activities, and love A.E. unconditionally; and A.E. stated she was ready to go home and hugged Mother after telling her that. Mother maintains this testimony showed she was able to meet A.E.'s emotional and physical needs now and in the future, she did not pose a danger to A.E., she had improved her parenting skills, she had a stable home, and A.E. wanted to return home. However, this evidence, if deemed credible, along with evidence that A.E. loved and was bonded to Mother and Mother was willing to seek out counseling services, while weighing against the jury finding was not the only evidence at trial, and this other evidence supports the finding. Of particular significance is the evidence of Mother's criminal history, history of abusive relationships, and choice to minimize her past drug use, even after her rights to her three older children had been terminated. Additionally, testimony showed that her impulsivity, inability to tolerate frustrations, and narcissism made it unlikely she was sincere about changes in her lifestyle and could permanently change her behavior. In fact, the record reflects that although Mother testified she learned from counseling and the various classes she received in jail how to make better choices, she withheld information from the psychologist and drug counselor who evaluated her. Finally, when A.E. came into foster care, she was anxious, guarded, showed signs of trauma, had a flat affect, and was socially and academically "behind." Though A.E. had benefitted from counseling and the nurturing and stable home of her foster parents, the

psychologist who assessed A.E. in 2013 and again in 2014 recommended on-going play therapy to help manage her anxiety, strengthen her coping skills, and eliminate her aggression. A.E.'s counselor also testified A.E. needed additional counseling after visiting with Mother for just an hour at a time each week and further testified A.E. had expressed wanting to stay in her foster home.

While a strong presumption exists that the best interest of a child is served by keeping the child with a natural parent, a presumption also exists that the prompt and permanent placement of the child in a safe environment is in the child's best interest. *See E.A.F.*, 424 S.W.3d at 750. The record before us shows that A.E. suffered trauma while living with Mother but made great strides in her foster home. The record also shows that A.E. had expressed a desire to remain in her foster home, and the foster parents planned on adopting her if Mother's rights were terminated. Although Mother completed many of the court-ordered services, demonstrated she had made some positive changes, and loved and was bonded with A.E., caseworker Walker-Banks testified her history provided "a road map for future risk," a risk too "huge" to take, as the CASA supervisor testified. Viewing the evidence under the appropriate standard and considering the various best interest factors, we conclude the evidence is legally and factually sufficient to support the jury's finding that termination of Mother's rights to A.E. was in A.E.'s best interest. *See*, *e.g.*, *In re A.W.*, 444 S.W.3d 690, 695-97 (Tex. App.—Dallas 2014, pet. denied) (concluding evidence that children's past living conditions with Mother impacted them, foster parents met children's emotional and physical needs and provided them stability, and Mother failed to show meaningful changes in her attitude supported best interest finding, even though evidence also presented showing Mother had "some" ability to provide for children's basic needs). Mother's sole issue is decided against her.

–15–

## III. CONCLUSION

Having decided Mother's sole issue against her, we affirm the trial court's judgment.

/Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE

141340F.P05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

IN THE INTEREST OF A.E., A CHILD

No. 05-14-01340-CV

On Appeal from the 304th Judicial District Court, Dallas County, Texas
Trial Court Cause No. 13-186-W.
Opinion delivered by Justice Lang. Justices Bridges and Evans participating.


In accordance with this Court's opinion of this date, we **AFFIRM** the trial court's judgment.


Judgment entered this 16th day of March, 2015.