**IN THE**
**TENTH COURT OF APPEALS**



No. 10-17-00318-CV

**IN THE INTEREST OF W.S., A CHILD**

**From the County Court at Law**
**Hill County, Texas**
**Trial Court No. 53531**

## MEMORANDUM OPINION

The trial court terminated the parental rights of W.S.'s mother ("Mother") after a bench trial.[1]  The trial court found that Mother had violated Family Code subsections 161.001(b)(1)(N), (O), and (P) and that termination was in W.S.'s best interest.  In her sole issue, Mother contends that the evidence is legally and factually insufficient to establish that terminating her parental rights was in the child's best interest.  We will affirm.

Both legal and factual sufficiency reviews in termination cases must take into consideration whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the matter on which the petitioner bears the burden

---

[1] The parental rights of W.S.'s father ("Father") were also terminated, but he has not appealed.

of proof. *In re J.F.C.*, 96 S.W.3d 256, 264-68 (Tex. 2002) (discussing legal sufficiency review); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (discussing factual sufficiency review).

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.

*J.F.C.*, 96 S.W.3d at 266.

In a factual sufficiency review, a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id*.

> [T]he inquiry must be "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." A court of appeals should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.

*Id.* (footnotes and citations omitted); *see C.H.*, 89 S.W.2d at 25.

We give due deference to the factfinder's findings and must not substitute our judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the sole judge "of the credibility of the witnesses and the weight to give their testimony." *Jordan v. Dossey*, 325 S.W.3d 700, 713 (Tex. App.—Houston [1st Dist.] 2010,

pet. denied*).  The factfinder may choose to believe one witness and disbelieve another. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005).

In a proceeding to terminate the parent-child relationship brought under Family Code section 161.001, the Department of Family and Protective Services must establish by clear and convincing evidence two elements:  (1) one or more acts or omissions enumerated under subsection (b)(1) of section 161.001, termed a predicate violation; *and* (2) that termination is in the best interest of the child.  TEX. FAM. CODE ANN. § 161.001(b)(1), (2) (West Supp. 2017); *Swate v. Swate*, 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied).  The factfinder must find that both elements are established by clear and convincing evidence, and proof of one element does not relieve the petitioner of the burden of proving the other.  *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976); *Swate*, 72 S.W.3d at 766.  "Clear and convincing evidence" is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980).  As noted, Mother does not challenge the trial court's finding that she violated subsections (N), (O), and (P).

In determining the best interest of a child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individual seeking custody; (5) the

programs available to assist this individual; (6) the plans for the child by this individual; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371-72. This list is not exhaustive, but simply indicates factors that have been or could be pertinent. *Id.* at 372. A single factor may be adequate in a particular situation to support a finding that termination is in the best interest of a child. *See In re B.H.R.*, 535 S.W.3d 114, 123 (Tex. App.—Texarkana 2017, no pet.); *see also In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.), *disapproved on other grounds by J.F.C.*, 96 S.W.3d at 267 n.39. We may also consider evidence supporting violation of one or more of the predicate acts in the best-interest analysis. *In re A.M.*, 495 S.W.3d 573, 581 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (citing *C.H.*, 89 S.W.3d at 27-28).

Melissa Wilson, the CPS investigator assigned to this case, testified that Mother came to the attention of CPS in Johnson County after her newborn tested positive for methamphetamine.[2] The CPS investigation regarding W.S. also involved allegations of methamphetamine use, as well as incidents of domestic violence at the home Mother and Father shared with W.S., Q.S. (Father's twelve-year-old son with "Stepmother"), and Father's father ("Grandfather"). Both W.S. and Q.S. reported that they had seen acts of violence between Father and Mother and between Father and Grandfather.

---

[2] Mother's parental rights to the newborn were eventually terminated.

After W.S. and Q.S. were removed from their home by the Department, both were placed with Stepmother. Wilson testified that a previous CPS investigation of Father and Stepmother regarding Q.S. resulted in Q.S. being placed in Father's custody. Wilson noted that Stepmother was referred to Family Based Safety Services and that she successfully completed the services mandated by the Department. She has had no further cases since that time.

Wilson testified that Mother tested positive for methamphetamine at the time of the termination trial regarding Mother's rights to her newborn baby, which was approximately one month before the Department was appointed temporary managing conservator of W.S. Kimberly Patty, a CPS conservatorship worker, further testified that Mother tested positive for methamphetamine use the one time she showed up for a drug test in this case.

Patty testified that a service plan was created for Mother, that the plan was explained to her, and that the plan was "made an Order of the Court." The plan required Mother to maintain stable employment and suitable housing, complete individual therapy and a psychosocial, and take classes in protective parenting. Patty noted that Mother was also required to undergo a drug abuse assessment, to submit to drug tests, and to refrain from criminal activities. Mother was also ordered to keep in contact with the Department. Patty reported that Mother had completed none of the plan's requirements.

Patty testified that she had no contact with Mother for approximately five months prior to the first trial setting in the case on August 3rd. Patty further noted that Mother said in April that she was taking care of an elderly gentleman in exchange for room and board. Mother reported to Patty at the time of the August 3rd hearing that the man had died and that she no longer had a place to live.

Patty additionally testified that a visitation plan had been set up, but Mother attended only two visits. At one of the visits, Mother appeared ten minutes before the visit was scheduled to end. Because of the disruption to the children from Mother's failure to appear at the scheduled visitations, Patty stated that further visits were suspended. She testified:

> [T]hat was one of the hardest things I've ever had to do, was explain to [W.S.] that their, you know, parents weren't coming, and he broke down and wept for ten minutes, and I had to sit there and hold him; I had to talk to him. And I've also spoken to [Stepmother] and her husband, you know. It's so hard on them; it's hard on those boys when they think their parents are coming and they don't, and that's why I suspended the visits, because all they were doing was getting their hopes up, and it broke their heart.

Patty and Stepmother both testified that W.S. eventually adjusted to the lack of visitations and that he stopped asking about Mother. Patty further noted that Mother did not send any letters to W.S. or provide any support for him during the time he was in Stepmother's care.

Stepmother testified that W.S had been in her home since November 2016 and that he has been doing well in her care. She placed W.S. on her private medical insurance and

has made sure that he is current on his shots and medications. Stepmother also had W.S.'s vision checked, and he was prescribed glasses. Since W.S. has been in her care, Stepmother has noticed positive changes in his behavior, such as being more playful and more willing to interact with others. W.S. is excited about his school and has been signed up for peewee football. Stepmother further testified that she believes further contact with Mother would have a detrimental impact on W.S. Stepmother stated that W.S. has bonded with her family and that her ultimate goal is to adopt W.S.

Patty concurred that W.S. was doing well in Stepmother's custody and that he has bonded with her family. Patty noted that Stepmother planned to adopt W.S. if Mother's parental rights were terminated. Patty also testified that as a result of the placement with Stepmother, W.S.'s emotional and physical needs are being met, he is no longer in any emotional or physical danger, and his home life is stable. Patty noted that the Department has no concerns about W.S.'s needs being met in the future or about him being in emotional or physical harm in the future. Finally, Patty stated that the Department believes that terminating Mother's parental rights is in the best interest of W.S.

### The Desires of the Child

W.S. did not testify about his desires. However, "[e]vidence that a child is well-cared for by his foster family, is bonded to his foster family, and has spent minimal time in the presence of a parent is relevant to the best interest determination under the desires of the child factor." *See In re A.W.*, 444 S.W.3d 690, 693-94 (Tex. App.—Dallas 2014, pet.

denied) (children did not testify, but court found their desires through evidence that children were happy with their foster placement and did not mention their mother as frequently at time of trial). Both Patty and Stepmother testified about the devastation W.S. suffered when Mother did not appear for her regularly scheduled visitations, but, as previously noted, W.S. stopped asking about Mother after her visitations were terminated. Additionally, Mother had no contact with W.S. for approximately four months before trial, and both Patty and Stepmother testified that W.S. has bonded with his foster family and is happy. The trial court could have reasonably concluded from Patty's and Stepmother's testimony that W.S. desired to stay with Stepmother's family.

### *The Emotional and Physical Needs of the Child Now and in the Future*
### *The Emotional and Physical Danger to the Child Now and in the Future*

Mother used methamphetamine during her pregnancy with her newborn, and she continued to use methamphetamine after W.S. had been removed from her custody. Mother failed the one drug test administered in this case and failed to comply with a request for additional testing. Additionally, Mother did not participate in any type of drug abuse assessment or treatment.

A parent's illegal drug use is relevant in determining present and future danger to a child's physical and emotional well-being. *See In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.—Waco 2008, no pet.). Continued drug use also demonstrates an inability to provide for the child's emotional and physical needs. *See In re M.R.R.*, No. 10-15-00303-CV, 2016 WL 192583, at *5 (Tex. App.—Waco Jan. 14, 2016, no pet.). The factfinder may reasonably

infer from a parent's refusal to take a drug test that the parent was using drugs. *Id.* Additionally, the factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to her parent. *See Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue").

In addition to her drug use, Mother was unemployed, had no place to live, and did not have the ability to provide a stable, permanent home for W.S. *See M.R.R.*, 2016 WL 192583 at *5 (continued drug use also demonstrates inability to provide stable environment for child). On the other hand, the Department's placement of W.S. with Stepmother provided him a stable and potentially permanent home. The goal of establishing a stable, permanent home for a child is a compelling state interest. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 87 (Tex. App.—Dallas 1995, no writ). The need for permanence is a paramount consideration for a child's present and future physical and emotional needs. *In re S.H.A.*, 728 S.W.2d 73, 92 (Tex. App.—Dallas 1987, writ ref'd n.r.e.).

### *The Parental Abilities of the Individuals Seeking Custody and the Programs Available to Assist These Individuals*

In reviewing the abilities of a parent, a factfinder can consider the parent's past neglect or past inability to meet the physical and emotional needs of their children. *See D.O. v. Tex. Dep't of Human Servs.*, 851 S.W.2d 351, 356 (Tex. App.—Austin 1993, no writ), *disapproved of on other grounds by J.F.C.*, 96 S.W.3d at 267 n.39. Mother's drug use, lack of

employment, and lack of residence prevented her from meeting the physical and emotional needs of W.S. in the past.

As Patty testified, Mother also failed to complete any of the requirements of the court-ordered service plan, including failing to attend parenting classes. A failure to complete a service plan can be one of a number of the acts or omissions by a parent that are relevant to a best-interest analysis. *See In re K.F.*, 402 S.W.3d 497, 506 (Tex. App.—Houston [14th Dist.] 2013, pet. denied); *In re A.B.*, 269 S.W.3d 120, 129 (Tex. App.—El Paso 2008, no pet.); *see also In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (noting that parent's failure to complete service plan supports finding that termination is in child's best interest). By failing to comply with the service plan, Mother also failed to avail herself of the programs that were set in place to assist her.

### *Plans for the Child by the Individuals or by the Agency Seeking Custody and the Stability of the Home or Proposed Placement*

The factfinder may compare the parent's and the Department's plans for the child and consider "whether the plans and expectations of each party are realistic or weak and ill-defined." *In re J.D.*, 436 S.W.3d 105, 119-20 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Patty and Stepmother testified that the plan for W.S. included adoption into Stepmother's family if Mother's rights were terminated. Their testimony also reflected that placement with Stepmother's family provided W.S. with stability and support— financial, medical, and emotional.

Although she was present during trial, Mother did not testify. There was, therefore, no evidence that Mother had a plan for W.S. or the ability to carry one out. A parent's failure to show that he or she is stable enough to parent a child for any prolonged period entitles the factfinder "to determine that this pattern would likely continue and that permanency could only be achieved through termination and adoption." *In re B.S.W.*, No. 14-04-00496-CV, 2004 WL 2964015, at *9 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.). As noted, the goal of establishing a stable, permanent home for children is a compelling state interest. *Dupree*, 907 S.W.2d at 87.

### *Acts or Omissions of the Parent that May Indicate the Existing Parent-Child Relationship Is Not a Proper One and Any Excuse for the Acts or Omissions of the Parent*

As noted, Mother did not testify. The evidence of Mother's continued drug use supported a determination that the parent-child relationship with W.S. was not a proper one. *See Latham v. Dep't of Family & Protective Servs.*, 177 S.W.3d 341, 349 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (drug abuse and failure to comply with service plan is evidence of improper parent-child relationship).

Viewing all the evidence in the light most favorable to the trial court's findings, we therefore conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of Mother's parental rights was in W.S.'s best interest. Viewing the evidence as a whole, we also conclude that a factfinder could have reasonably formed a firm belief or conviction that termination of Mother's parental rights was in W.S.'s best interest. We thus hold that the evidence is legally and factually

sufficient to establish that terminating Mother's parental rights was in W.S.'s best interest.

We overrule Mother's sole issue and affirm the trial court's order of termination.



REX D. DAVIS
Justice

Before Chief Justice Gray,*
    Justice Davis, and
    Justice Scoggins
    *(Chief Justice Gray concurs in the court's judgment to the extent it affirms the trial court's judgment.  A separate opinion will not issue.)
Affirmed
Opinion delivered and filed March 28, 2018
[CV06]

