**AFFIRMED and Opinion Filed November 12, 2018**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

### No. 05-18-00645-CV
_____

## IN THE INTEREST OF C.A. AND L.A., CHILDREN

**On Appeal from the County Court At Law No. 1**
**Kaufman County, Texas**
**Trial Court Cause No. 95793-CC**

# MEMORANDUM OPINION

Before Justices Francis, Fillmore, and Whitehill
Opinion by Justice Whitehill

Appellant (Father) appeals from an order terminating his parental rights as to his daughter

L.A.[1]  He asserts two issues:

> (i) the evidence is legally and factually insufficient to support the trial court's findings under Texas Family Code § 161.001(b)(1)(D) and (E) and

> (ii) the evidence is legally and factually insufficient to support the trial court's finding that termination is in the child's best interest.

We affirm, holding that (i) any error demonstrated in issue one is harmless because Father

does not challenge two other termination grounds found by the trial court and (ii) the evidence is

legally and factually sufficient to support the trial court's best-interest finding.

---

[1] The other child listed in the case style, C.A., is not Father's child.  C.A. and L.A. have the same mother, and Mother's parental rights as to both children were also terminated in this case.  Mother did not appeal.

## I. BACKGROUND

Father and Mother have one child born by them, L.A. Father also had a child, L.S., with a different woman. And Mother had another child, C.A., with a different man, R.J.B.



In August 2016, the Texas Department of Family and Protective Services removed C.A. and L.A. from Mother and Father's custody and filed this case seeking to terminate both parents' rights. The Department alleged that at the time C.A. was three years old and L.A. was six months old.

Mother and Father answered. C.A.'s father never personally appeared, but an attorney was appointed for him.

Temporary orders made the Department the children's temporary managing conservator. In May 2017, the parties signed a mediated settlement agreement imposing numerous requirements on Mother and Father, such as paying child support and providing proof of employment. In June 2017, they signed a family service plan containing similar requirements.

C.A. and L.A. were placed with the same foster parents. In November 2017, the foster parents intervened in the termination suit requesting (i) appointment as the children's joint managing conservators and (ii) termination of the children's parents' rights.

The case was tried without a jury. After one day of trial in January 2018, the court recessed the trial so the parties could mediate the case. The trial resumed in April 2018 for four more days. Mother's affidavit of voluntary relinquishment of parental rights was admitted into evidence. She

also testified that there was an agreement that she would still have visits with the children four times a year. Many other witnesses testified at trial, but Father did not.

The trial court rendered judgment terminating Mother's parental rights as to both children and Father's parental rights as to L.A. The judgment also gave Mother quarterly supervised visitation with the children, consistent with her testimony. It appointed the Department as permanent managing conservator for both children. It also appointed C.A.'s father as her possessory conservator.

Father timely appealed.

## II. ANALYSIS

### A. Issue One: Was the evidence sufficient to support the trial court's findings under Family Code § 161.001(b)(1)(D) and (E)?

The trial court found by clear and convincing evidence that Father engaged in the conduct described in Texas Family Code § 161.001(b)(1)(D), (E), (F), and (O). In Father's first issue, he argues that the evidence was legally and factually insufficient to support the findings under § 161.001(b)(1)(D) and (E).

However, only one § 161.001(b)(1) predicate finding (plus a best-interest finding) is necessary to support a judgment terminating parental rights. *See* TEX. FAM. CODE § 161.001(b)(1)–(2). Father does not challenge the trial court's findings under § 161.001(b)(1)(F) and (O). Accordingly, any purported error in the court's findings under § 161.001(b)(1)(D) and (E), (which we do not address), is harmless, because the findings under § 161.001(b)(1)(F) and (O) would remain to support the judgment. *See In re A.H.J.*, No. 05-15-00501-CV, 2015 WL 5866256, at *9 (Tex. App.—Dallas Oct. 8, 2015, pet. denied) (mem. op.).

We overrule Father's first issue.

**B.**     **Issue Two:   Was the evidence sufficient to support the trial court's finding that terminating Father's parental rights was in L.A.'s best interest?**

Father's second issue argues that the trial court's best-interest finding is supported by legally and factually insufficient evidence. We disagree for the reasons stated below.

**1.        Standard of Review**

Because terminating parental rights implicates fundamental interests, the clear and convincing standard of proof applies in termination cases. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). "Clear and convincing evidence" is the measure or degree of proof that will produce in the factfinder's mind a firm belief or conviction as to the truth of the matter to be proved. FAM. § 101.007.

Our standards of review reflect the elevated burden at trial. *In re N.T.*, 474 S.W.3d 465, 475 (Tex. App.—Dallas 2015, no pet.). Specifically, in both legal and factual sufficiency review, we consider all the evidence. *Id.* Under both standards we defer to the factfinder's determinations as to witness credibility. *Id.*

In a legal sufficiency review, we credit evidence that supports the verdict if a reasonable fact finder could have done so, and we disregard contrary evidence unless a reasonable fact finder could not have done so. *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). However, we do not disregard undisputed facts that do not support the verdict. *Id.* at 113. If no reasonable fact finder could form a firm belief or conviction that the matter to be proven is true, the evidence is legally insufficient. *Id.*

In a factual sufficiency review, we likewise determine whether the fact finder could reasonably form a firm belief or conviction about the truth of the State's allegations. *In re A.B.*, 437 S.W.3d at 502. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient."

–4–

*Id.* at 503 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We must undertake an exacting review of the entire record with a healthy regard for the constitutional interests at stake. *Id.* However, our review "must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

### 2. Applicable Law

The trial court may terminate the parent–child relationship if the factfinder finds by clear and convincing evidence that (i) the parent committed one or more acts or omissions enumerated in family code § 161.001(b)(1) and (ii) termination is in the child's best interest. FAM. § 161.001(b).

Although there is a strong presumption that maintaining the parent–child relationship serves the child's best interest, there is also a presumption that promptly and permanently placing the child in a safe environment is in the child's best interest. *In re D.W.*, 445 S.W.3d 913, 925 (Tex. App.—Dallas 2014, pet. denied).

The supreme court has identified a nonexclusive list of factors that may be relevant to a best-interest determination, depending on the facts: (i) the child's desires, (ii) the child's current and future emotional and physical needs, (iii) current and future emotional and physical dangers to the child, (iv) the parental abilities of those seeking custody, (v) the programs available to help those individuals promote the child's best interest, (vi) those individuals' plans for the child, (vii) the home's or proposed placement's stability, (viii) the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one, and (ix) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). An absence of evidence of some *Holley* factors does not preclude a finding that termination is in the child's best interest,

particularly if undisputed evidence shows that the parental relationship endangered the child's safety. *In re N.T.*, 474 S.W.3d at 477.

The Family Code also identifies several factors relevant to a best interest analysis. FAM. § 263.307(b).

### 3. The Evidence

There is evidence of these facts:

#### a. Father's Early Life

Father was born in 1988.

Father's therapist testified that he reported having a "terrible upbringing." From about the age of thirteen or fourteen, Father was largely away from "his house" and had "kind of an alternative family" with some older people in the community from whom he learned "a lot of negative stuff and also some criminal thinking."

#### b. Summary of Father's Domestic Relationships

Because the facts involve three different domestic relationships and several different children resulting from those relationships, we provide this brief summary to identify the people most important to our analysis.

In 2010, Father married a woman we refer to as "Ex-wife" because they eventually divorced. In 2011, Father and Ex-wife had a daughter, L.S., who is the subject of a separate action in Dallas County. Father and Ex-wife separated in August 2014, but they did not divorce until sometime in 2017.

Father and Mother began a relationship in or about 2014. Mother already had a daughter, C.A., from a prior relationship. C.A. was born in July 2013.

Father and Mother's daughter, L.A., was born in January 2016. Mother and Father ended their relationship in roughly mid-2016.

At some point, apparently in 2017, Father began a relationship with a person we refer to as "Girlfriend." She had three minor children, two boys and a girl, each with a different father. Father and Girlfriend were still dating during trial.

### c. Father's Relationships with Ex-wife and L.S.

#### (1) Ex-wife's Testimony

Ex-wife testified to the following facts:

Ex-wife and Father married in March 2010 when she was eighteen and Father was around twenty-three. Before they were together, Father used cocaine, methamphetamine, "pills," and marijuana. About six or seven months into their marriage, Father "tried to get [Ex-wife] to be okay with him using drugs," but she told him no. To her knowledge, Father did not use drugs during their marriage.

About a year after they married, there was an incident in which they were "just kind of wrestling around," and when she stopped, Father held her down and started biting the insides of her thighs "really hard." She told him to stop, but he bit her six or seven times. He bit her so badly that she "couldn't walk right for a couple of weeks."

Ex-wife became pregnant with their daughter, L.S., in early 2011. During that summer, when she was about five months pregnant, she and Father were arguing about something. Father first grabbed her tightly around her stomach, then picked her up by the throat and slammed her down on the porch.

L.S. was born in December 2011. Father did not help Ex-wife with L.S.'s basic needs aside from "chang[ing] a couple of diapers." Father made threats to take L.S. away from Ex-wife starting when L.S. was about three months old. In mid-2012, Father and Ex-wife separated after an argument. Father threatened to take L.S. to Tennessee, but the police intervened, and Ex-wife took L.S. and stayed with someone else temporarily.

–7–

There was another incident of domestic violence around Christmas 2013. About a week before Christmas, Father learned that Ex-wife had cheated on him. On Christmas, Father started screaming at her, and he started pushing her when she tried to get away. She tried to call the police, but he grabbed her phone. Father "us[ed] his body" to push Ex-wife around, and two-year-old L.S. cried and followed Ex-wife around. Ex-wife got to the kitchen door, and Father shoved her "really hard." There were stairs outside the door, but she hit the banister and managed to catch herself. L.S. was still inside the apartment. Ex-wife then called the police, and Father was arrested. Father bonded out of jail, returned to the apartment, and took L.S. away overnight. Ex-wife later found out that Father left L.S. with his mother that night.

Father and Ex-wife separated in August 2014. A court case started in October, and Ex-wife had custody of L.S. on weekends. Ex-wife would pick L.S. up at a "court-ordered visitation spot" because Father refused to reveal where he lived. L.S. would be upset every time Ex-wife picked her up, but she would calm down as soon as Father left.

When Father started his relationship with Mother, they conditioned L.S. to not want to be with Ex-wife. They recorded themselves taking L.S. to a store, holding a toy behind their backs, and telling L.S. that she had to go visit Ex-wife and she couldn't have the toy until she got back.

L.S.'s development also reversed after Father and Ex-wife separated. L.S. was fully potty-trained at the time, but then it "went completely backwards" and Ex-wife had to put L.S. back in diapers. L.S. seemed lighter in weight, and she was covered with red insect bites every time Ex-wife saw her. L.S. also started throwing tantrums when she wasn't given a tablet or a phone to play with, and she would have a meltdown in a store when she wanted a toy she couldn't have. She was mean to other children, she wouldn't share, and she would scream and yell at Ex-wife when she was frustrated.

Starting in July 2015, Father had sole custody of L.S., apparently because Ex-wife failed to appear at a hearing. During the period of sole custody, L.S. had six urinary tract infections.

Dallas County CPS removed L.S. from Father in August 2016,[2] and Ex-wife became L.S.'s primary caregiver in October 2016.

In October 2017, Ex-wife was granted sole conservatorship, with Father having supervised visitation twice a month.

As of April 2018, Father had not visited L.S. since October 2017. Ex-wife testified that it would have been in L.S.'s best interest to terminate Father's parental rights. She further said that:

- In 2014, after she left Father, he threatened to show up at her residence, take L.S., and disappear. She obtained a criminal trespass warning against him so that he could not go on the road where she lived.

- In 2015, Father and Mother called Ex-wife's place of employment and tried to get information such as her Social Security number and her work schedule.

- Also in 2015, Father called a hospital and threatened to blow it up because it wouldn't disclose to him certain medical records about L.S. The hospital made a police report about the incident.

- Mother told Ex-wife that Mother and Father were using methamphetamine together.

- Ex-wife does not feel safe when Father is with L.S. even in a supervised environment because he doesn't like to follow rules or obey the law.

- After visits with Father, L.S. engaged in behaviors such as (i) singing "cuss words," (ii) screaming, yelling, and cursing at Ex-wife, (iii) acting pushy and bossy, and (iv) saying she wanted to go to Father because he told her he would give her toys.

- When Ex-wife and Father were together, he was always angry and did not deal with stress well. She did not see him make any changes to fix those problems, and she did not see him as someone who could change and grow.

- When Father doesn't get his way, he threatens, manipulates, gets angry, and yells and curses at people.

---

[2] As we discuss below, another witness testified that L.S. was removed based on neglectful supervision after Father was found unconscious in a ditch.

- Father has more than once threatened to kill Ex-wife. He never made those threats directly to Ex-wife, but he made them to other people. These threats occurred in 2016, after CPS removed L.S.

- Ex-wife changed her telephone number four times because of Father's harassment.

- At one point Father was banned from L.S.'s daycare.

Ex-wife's testimony about Father was not entirely negative. She acknowledged that Father didn't hurt L.S. while Ex-wife and Father were together, aside from the occasional spanking. She believed that Father loves L.S. "[t]o a degree" and "has some kind of connection with her," but she also feels that part of the reason he wants to keep her is money.

Ex-wife also admitted that she smoked marijuana in 2015 and 2016 after she and Father had separated. She even smoked marijuana while she was pregnant with a subsequent child. She also admitted violating court orders regarding the time and place of her possession of L.S. during that case.

Nevertheless, it was the trial court's prerogative to assess her credibility, and it was entitled to credit her testimony favorable to the judgment. *See In re M.A.M.*, 346 S.W.3d 10, 14 (Tex. App.—Dallas 2011, pet. denied) ("The trial court, as the fact finder in this case, is the sole judge of the credibility of the witnesses and the weight to be given their testimony.").

### (2) Other Witnesses' Testimony

Jasmine Brooks, who was Father's case worker in the Dallas CPS case regarding L.S., testified that:

L.S. was removed from Father's custody in August 2016 for neglectful supervision. Father was found unconscious in a ditch while a grandparent was watching L.S. At first the Department believed he had attempted suicide, but an investigation showed reason to believe he was under the influence of drugs. And Brooks believed that Father was under the influence of amphetamine and methamphetamine.

Brooks had her first contact with Father at a hearing. Father appeared ungroomed, unkempt, and agitated at the hearing.

During the Dallas CPS case, Father had supervised visits with L.S. at a Department office in Dallas. The monitor had to call Brooks in two or three times because of problems during Father's visits such as cellphone use (contrary to the rules), inappropriate music, pulling L.S.'s hair, covering her mouth and nose, and generally not cooperating with the visitation rules. Father laughed when he pulled L.S.'s hair and when he covered her mouth and nose. He also licked L.S.'s cheek multiple times, which Brooks did not consider normal parental behavior. Father's conduct was inappropriate in that it could teach L.S. that Father's actions were appropriate behavior.

Father was argumentative with Brooks when she attempted to redirect his behavior. In Brooks's words, "[h]is lack of maturity was alarming" in his responses to her efforts to redirect his behavior. Based on Father's behavior during visits, Brooks concluded that he did not have an appropriate parent–child relationship with L.S.

Furthermore, Father made threats against a Kaufman County case worker involved in this case and Ex-wife was afraid of Father. Brooks believed that Father would fulfill his threats to physically harm Ex-wife and the Kaufman County case worker. Father became upset easily when Brooks would explain why he couldn't do certain things. He did not have appropriate coping skills to handle his anger. Brooks believed that Father would become aggressive and violent if a child consistently refused to listen to him. She believed that the term "[e]ndangerment" fits Father.

On the other hand, Brooks believed that Father loves L.S., and she did see some visits in which Father was appropriate with L.S. He also showed concern for L.S.'s well-being in his conversations with Brooks. Brooks explained that the Department decided not to seek to terminate Father's rights as to L.S. "due to legal grounds in Dallas and just what Dallas' standards for termination are."

Mother testified that Father threatened "[h]is daughter," apparently meaning L.S., "with a belt all the time."

Father's therapist testified that it would be abusive for a parent to threaten "almost on a daily basis to hit or beat the child with a belt as discipline."

### d. Father's Relationships with Mother, C.A., and L.A.

#### (1) Mother and Father's Relationship

Mother testified to the following facts:

She and Father started a relationship in or about 2014. Mother already had a daughter, C.A., who had been born in July 2013. Mother gave birth to her and Father's daughter, L.A., in January 2016.

When L.A. was three weeks old, Father threatened to take her away from Mother, and he did in fact take her away until Mother could get a writ of attachment requiring him to give L.A. back to her. When Father took L.A. away, he did not have a car seat for her. Instead, "[h]e just put her in the back seat and took off."

In about March 2016, Mother and Father used methamphetamine together at home. They were downstairs, and the girls were upstairs with a monitor. In roughly the same time frame, there was an incident in which Father threatened to kill Mother, and she called the police. No arrest resulted from that incident.

Police records were admitted into evidence regarding incidents during the summer of 2016. For example, in July 2016, police were dispatched to a Garland residence for a family disturbance. According to the report, Mother and Father were arguing about her wanting to move out and take L.A. with her. Both Mother and Father said that there had been violence in the past "by both subjects" but none that day.

Two days later, the police responded to a report that Father was missing and was having suicidal thoughts, perhaps because Mother had left with L.A. Further notes indicate that he was found in another county the next day and "was believed to be on some sort of drug."

Finally, a third report indicates that on August 1, Mother reported that Father had stolen her birth certificate and Social Security card "after they broke up their relationship."

CPS removed both children, C.A. and L.A., from Mother and Father's home in early August 2016.

### (2) The Children's Removal from Mother and Father's Care

A family service plan admitted into evidence recited that on August 3, 3016, the Department received a report that C.A. and L.A. were being abused and neglected. The report cited (i) concerns of drug usage by Mother and Father and (ii) Father's threats to harm Mother and take L.A. out of state.

Department investigator Tyler Redman testified that:

On August 3, 2016, he was assigned C.A. and L.A.'s case. The next day, he met with Mother at a friend's house in Kaufman County. Mother admitted to experimenting with various drugs and to using methamphetamine three weeks earlier. She said the children were upstairs in bed while she was using methamphetamine, which Redman considered endangering conduct because it would have been difficult for her to respond to the children's needs. Mother also said that Father (i) had threatened to kill her, the children, and other family members, (ii) had threatened to run away with one or both children, and (iii) was verbally and emotionally abusive to her.

Redman observed the children and had no concerns about their appearance, although they were found to have lice.

Mother took an oral swab drug test and tested positive for amphetamine and methamphetamine. She then admitted using methamphetamine two or three days earlier. And she said that she and Father used methamphetamine together "a couple of times per week."

Redman investigated placing the children with some of Mother's relatives. But those options did not work out because Father had made threats against those relatives in the past and he knew where they lived. So the children went into foster care.

Father called Redman on August 8, and he was "very erratic," and "didn't want to listen to anything over the phone." Father did "a lot of cussing" and "was really mad that he hadn't been contacted yet."

A few days later, Father and Redman met in person. Father admitted some past marijuana use, including once within the previous two weeks, but he denied Mother's statements that they had smoked together. He also denied ever threatening Mother.

Redman obtained the results of a drug test Father took on August 8 for the Dallas County CPS case. Father tested positive for marijuana, amphetamine, and methamphetamine. The marijuana result indicated recreational usage, and the methamphetamine level was "at a concerning level" indicating daily usage. In Redman's experience, someone using methamphetamine daily cannot be a "successful protective parent" because the drug could severely affect their decision-making and pose a huge risk to young children.

Rhonda Davis was the Kaufman County CPS case worker on C.A. and L.A.'s case for most of its duration. She testified that the children were behind on their immunizations, had lice, and were in a state of neglect when CPS removed them from Mother and Father. C.A. was also very behind socially.

### (3)    Father's Conduct During the Progress of This Case

Davis testified that:

Father and Mother were a couple when the case started in August 2016, and they were together off and on until December 2016. Their relationship was volatile. Mother depended emotionally on Father, and he was very controlling.

In August 2016, Father tested positive in an oral swab drug test. When Davis refused to retest him, Father asked to speak to Davis's supervisor. When she came out and met with him, he was belligerent and combative, and he "was cussing to the point to where we had to terminate his visit and . . . a security guard escorted him out."

In September 2016, Father signed a family service plan requiring him to complete various services, including drug treatment, a batterers intervention program, individual therapy, anger management classes, a psychological evaluation, parenting classes, and NA/AA attendance three times per week. The plan also required him not to "alter his hair in any way including, but not limited to, cutting, dying, or perming the hair." This requirement was so that Father's drug screens would be accurate. The plan also gave Father weekly supervised visits with L.A. at the Kaufman CPS office.

In October 2016, Father was taken to a mental health facility because of a suicide attempt. Davis's testimony was corroborated by Father's medical records, which were admitted into evidence. According to those records:

> This is the first admission to our facility for this 27-year-old separated Caucasian male with a long-standing history of methamphetamine and alcohol abuse. He presented complaining of worsening mood and depression related to numerous stressors in his life, voicing suicidal thoughts . . . . He also voiced homicidal thoughts towards his ex-wife and her fiance as well as some CPS workers. He describes no intent, but says he has access to weapons. He has a history of previous suicide attempts. He has a history of some assaultive behaviors in the past. . . . He has several failed attempts at sobriety. Admits to daily use of alcohol recently as well as episodic use of methamphetamine and occasional cocaine.

Davis testified that she and Father had some "constructive, productive conversations" when he was on medication after this hospital stay, but this ended when he stopped taking his medications.

–15–

On another occasion in October 2016, Davis "witnessed over the phone" Father being verbally abusive to Mother. Father would not allow Davis to talk to Mother, and Davis became so alarmed that she called the police and had them do a welfare check "to make sure [Mother] was okay."

Davis testified that Father took an oral swab test that came back positive for cocaine. She believed that this happened in October 2016. Father denied using cocaine, but Davis later heard that he told others that he had accidentally used it. In November 2016, Father took a hair drug test that was positive for amphetamine and methamphetamine. Again, he denied any drug usage. On another occasion in late 2016, Father told Davis that he had drunk an entire bottle of tequila and passed out in a friend's yard.

On December 2, 2016, there was an incident that led to Father's hospitalization and eventual arrest. Mother later reported to the police that on that date, Father sought to have sex with her. When she refused, he became angry and verbally abusive. She eventually slapped him, which led to a struggle that culminated in his choking her and saying, "I will fucking kill you and your family." He let her go after someone else who lived at the same residence walked in. Mother then went to a women's shelter.

According to a different police report, some police officers were sent to a residence in Mesquite that afternoon to respond to a report that Father was there and was suicidal. Father had barricaded himself in a bedroom, and when the police arrived Father "stated on multiple occasions that he had nothing to live for and if he came out of the room that he would have a weapon." He surrendered after about three hours and was taken to a hospital.

Father's hospital records show that (i) he said "he did not want to go on living anymore" and (ii) he was uncooperative, agitated, and angry. He acknowledged that he "was using methamphetamine in binges up until 2 weeks ago." The records further said:

He is suicidal with multiple plans. He had threatened to cut his wrist. He punched his hand through the windshield of his truck while on the phone with CPS. He demonstrates risk of self-harm and needs inpatient stabilization. . . . Says because CPS would not tell him where his ex-wife is, in [sic] which rehab she is in, he is not going to cooperate with CPS anymore and not going to cooperate with treatment.

His urine drug screen was negative. During Father's hospitalization, he gradually engaged and stabilized, and he was discharged on December 20, 2016. His discharge diagnoses included "Amphetamine dependence" and "Bipolar disorder, not otherwise specified."

Records showed that Father was arrested in mid-January 2017 for vehicle registration and insurance violations. The records indicate that Father "banged his head against the rear passenger window" as he was being taken to the Kaufman County Law Enforcement Center.

Also, in the January–February time frame, Father violated his family service plan by coloring his hair and shaving much of it off. Davis testified that coloring the hair affects the Department's ability to drug test, and clients commonly alter their hair to manipulate the Department's ability to assess their drug usage. Moreover, after Father changed his hair, Davis did not have any positive drug tests from him. She found this very concerning because she had never seen a client go from the drug levels Father had previously shown to "clean on everything." She believed that Father manipulated the drug tests after November 2016 to remain negative. Father points out, however, that some of his negative hair follicle drug tests used hair from other parts of his body, such as his leg and arm.

Mother eventually reported the December 2, 2016 violence to the police, and Father was arrested in February 2017. A June 2017 order of deferred adjudication related to the December 2 incident was admitted into evidence. It showed that Father pled guilty to a third-degree felony of "assault family violence" under Penal Code § 22.01(b)(2)(B) and that he was placed on community supervision for three years.

Davis testified that Father remained very combative and very threatening with her as the case went on. If he did not get what he wanted, "he would threaten, cuss. He acted almost like a child that didn't get [his] way on something." In May 2017, Davis stopped being Father's case worker, but she remained the case worker for Mother and the children. Father wanted another case worker, and he had made threats against Davis and her husband. Davis sought a criminal trespass warning against Father because a vehicle strongly resembling his had been seen parked near her house. Father also threatened her at the office; according to Davis, he said "[h]e was going to go get his people and his 9 millimeter and come back and give me what I deserved."

Justin Ryan, who became Father's case worker in late May or early June 2017, testified to the following facts:

Ryan communicated with Father frequently about the services Father needed to complete. If they were communicating face-to-face, Father's attitude was "very aloof" and "just kind of blowing you off." But if they were communicating over the phone, it was usually about Father's wanting the Department's permanency goal changed, and Father "would be very belligerent, very rude and demanding about, well, I'm not going to do anything until you do this." Ryan's opinion based on feedback from service providers and his own experience was that Father did not take the case very seriously.

Like Davis, Ryan questioned Father's sobriety because of the discrepancy between his positive drug test in November 2016 and his completely negative test roughly ninety days later. He was concerned that Father was somehow altering his drug tests.

Ryan testified that Father violated court orders, his family service plan, and a mediated settlement agreement. For example:

- Dallas CPS and the Dallas Police Department confirmed that Father acted as a caregiver of Girlfriend's children, in violation of court order.

- Father did not give a social history, as required by the mediated settlement agreement.

- Father did not obtain a psychiatric evaluation, as required by the family service plan.

- Father did not pay child support as required by the mediated settlement agreement and the family service plan.

- Father did not provide monthly pay stubs as required by the family service plan.

- Father did not provide proof of stable housing as required by the mediated settlement agreement.

- Father did not attend NA/AA meetings as required by the family services plan and court order.

Additionally, although Father did not test positive for methamphetamine again after November 2016, he tested positive for codeine twice. The first time was in summer 2017, and he had a doctor's note or prescription explaining it. He tested positive for codeine again in March 2018, during the trial's recess. No prescription or other documentation to explain that positive test was admitted at trial, but the record indicates that on the last day of trial he produced to the Department a pill bottle labeled with the prescription information.

Ryan testified that he had several concerns about Father: (i) his history raised a concern whether he would be able to provide L.A. a safe and stable home free from abuse, neglect, and violence, (ii) his failure to pay child support or provide proof of employment made it impossible to know whether he can provide stable housing and meet L.A.'s financial needs; (iii) Ryan did not believe Father could be a safe person around his children outside the Department's supervised environment because he is belligerent when he is not there; (iv) Father has not shown an ability to provide for his children long-term; (v) Ryan was still concerned that Father had not addressed the drug issues that were present at the beginning of the case, based on suspicions regarding his negative drug tests, his recent positive test for codeine, and his non-attendance at NA/AA meetings; (vi) Father's honesty was "a huge issue" throughout the case; and (vii) although Father

was discharged from his mental-health hospitalizations with prescriptions, Ryan did not know whether Father had followed up with them, and Father stated "he doesn't want to be on medication." However, Ryan also acknowledged that Father was kind and loving with L.A. during his supervised visits.

### (4)  Evidence About C.A.

There was limited evidence about Mother's older child, C.A., and Father's relationship with her. Molly Milligan, who was the case manager for the foster family C.A. and L.A. were placed with, testified that C.A. was three years old when she was placed with the foster family. At that time, C.A. had an injury near her eye, her eyes were "kind of sunken," she was very small and pale, and she appeared underweight. Her speech was extremely limited. But by the time of trial, she had caught up with her classmates verbally.

The court-appointed special advocate for the children, Toni Garcia, also testified that C.A. was very fearful of any new person she might be introduced to. She attributed this to exposure to domestic violence.

Mother testified that after the children were removed, C.A. saw Father at a CPS facility on one occasion. Mother further said, "She was scared and she ended up peeing in her pants, I believe." Milligan testified that C.A. experienced "night terrors" after she saw Father. According to Milligan, C.A. "would be screaming, crying, completely inconsolable."

Davis also witnessed an encounter between Father and C.A. after the removal. According to Davis:

> Before [C.A. saw Father] she was playing, riding a tricycle around the office. When she saw him, she was very clingy, she would not let me out of her sight. She would not even drive her tricycle on that end of the building. She avoided it completely.

Davis also said that C.A. cried when she saw Father.

### e. Father's Relationship with Girlfriend

Girlfriend testified to the following facts:

Girlfriend had three minor children, each by a different father. She was never married to any of those men. The father of her first child used marijuana. The father of her second child was abusive and used to choke, hit, and kick her. She didn't report him because she was afraid of him. The father of her third child was a drug dealer, and he also physically abused her. Her children were in the residence when he abused her, but she didn't report it because he threatened to kill her. The father of her second child was in jail, but the father of her third child was "on probation" at the time of trial.

CPS got involved in her life in January 2017 and placed her children with her grandfather. Pursuant to a service plan, she went to Homeward Bound, a rehab center for drug users, because she using methamphetamine.

She and Father met at Homeward Bound and started living together in June 2017. They became boyfriend and girlfriend around Christmas 2017.

Girlfriend testified that the last time she used methamphetamine was March 17, 2018, which was about six weeks before the day she testified in court. But she also testified that she and Father had been "living a clean and sober lifestyle" since December 2017. Father had a job that he had held for four or five months. He was never physically violent or emotionally abusive with her and never threatened her. Girlfriend also said that Father loves his children and "his child" (apparently L.A.) loves him.

Other evidence showed that Girlfriend was leasing an apartment in Dallas. Apartment manager Kelly Garber testified that she became aware that Father was staying with Girlfriend in roughly late 2017. At that time, other residents started complaining about loud noise, screaming, excessive smoking, and "[j]ust a lot of people hanging out in front of the unit basically, different

people screaming." Because of the complaints, Brown's lease was not going to be renewed when it expired at the end of June 2018. Father applied to be a resident, but he was rejected because he "had some court evictions on his record."

Father's therapist was concerned when she learned that Father was seeing someone he met in substance abuse treatment. She suggested that he not see Girlfriend "because after substance abuse treatment, you really shouldn't hook up with anybody for at least a year." It is not safe because recovery is very difficult and "[y]ou don't just all of the sudden not use simply because you went to substance abuse treatment." Although Father said that he and Girlfriend were keeping each other from using drugs, the therapist "still did not think it was a good idea."

Case workers Davis and Ryan both testified that Father lied to the Department that he was not in a relationship with Girlfriend. Davis also testified that Father sometimes brought Girlfriend to his supervised visits with L.A., but Girlfriend usually didn't engage with L.A. and there was no bond between them.

### f. Other Evidence

### (1) Pam Davis

Pam Davis testified as follows:

She is a Battering Intervention Prevention Program (BIPP) facilitator. She provided BIPP services to Father for at least three to four months of a twenty-four-week class. Father was "extremely challenging. Every class, he was challenging." In her opinion, Father did not learn from the program. According to her,

> We knew [Father] as the way he was in every class, his demeanor, his personality never changed. He talked about knowing people in high places, cursing someone out, having guns, things of that nature. He talked about that regularly.

She also said, "Every time he talked[,] and I'm not even exaggerating, it was harming someone, cursing someone out, knowing someone, to get someone to hurt someone else." His failure to

show any change over the course of the program was "[e]xtremely abnormal." Although she never felt physically threatened by Father, others who taught the class reported that "they felt threatened in some form or fashion." She thought he was credible when he said that he was going to hurt someone, that he was going to get someone to hurt someone else, or that he had guns.

Father technically completed the class, but facilitator Davis felt that he viewed it as an item on a checklist that he had to do. She never saw Father use the tools he was taught to control his anger. She never saw Father interact with children, but she thought it was possible he would pose a danger to a small child if he were a primary caregiver. Based on her observations, Father was not safer to be around after the BIPP class than he was before.

### (2) June Groom

Groom testified that:

She was the executive director of a residential home for mothers and children in crisis. Mother was a client at the shelter. Mother told Groom that Father had physically and mentally abused her and that she was extremely afraid of him. Groom found Mother to be a credible victim of domestic violence. Based on her interactions with Mother and CPS, Groom thought it would not be in L.A.'s best interest to remain with Father.

### (3) Lois Vaillancourt

Vaillancourt testified to the following facts:

She's a licensed professional counselor and was Father's therapist from roughly March to October 2017. Her goals for him included anger management, stress management, and creating a drug-free environment for his children. At first, Father "was not willing to engage in therapy and he was ridiculously silly" to the point that Vaillancourt discharged him from treatment. She thought he didn't want to be there and wasn't taking the process seriously. But later he came back and was more willing to do the work, and she worked with him. Even then, he still acted silly, and

she had to correct his behavior. Vaillancourt thought he made progress and came to a point of maximum benefit, and she "successfully discharged him from treatment." But even when she discharged him, she did so with a recommendation that he get a psychiatric evaluation.

Vaillancourt believed that Father loves his children dearly, but based on reports she received she thought that his way of playing with them was "silly and not in good taste and not healthy for little girls." In particular there was a report that during one visit with his daughter (apparently L.S.), Father first put a baby doll on a stove as if to burn it "and then wanted to put the little girl on the stove." Vaillancourt thought that was "completely inappropriate," but she believed that Father thought it was funny. She also got a report that Father licked L.S.'s face. Vaillancourt didn't think that these reports were enough information for her to recommend that Father would not be an appropriate caregiver for his child, but she thought it was enough for her to say that he probably needs some parenting classes and childhood developmental classes. Nothing she learned during the counseling indicated to her that Father would be a physical danger to his child.

### (4) Molly Milligan

Milligan testified that:

She was the case worker for the foster family in this case. She was present in court for a number of proceedings in the case. In late 2017, during a court proceeding, she overheard Father talking to someone she assumed was his girlfriend. She heard Father say that he was going to run his case worker, Justin Ryan, off the road and splatter him across the highway. Father also said that Ryan deserved to die for what he had done to Father and that he hoped his wife died too. Milligan also heard Father call the judge a "retard" and say that he shouldn't have to stand up for him because he didn't respect him.

### (5) Pamela Tovar

Tovar testified as follows:

–24–

She is the Department's legal liaison for Kaufman County. She opined that the Department had presented enough evidence to support terminating Father's parental rights. She named several factors that went into her opinion: (i) Father's untreated mental health issues, (ii) his refusal to comply with simple requirements like providing his address, (iii) his abusive behavior in relationships, even with his children, (iv) his instability, (v) his failure to show the ability to provide financially for his children, and (vi) his drug use. She added that L.A.'s best interest was to continue staying where she was, with her sister, where they had been for the last two years.

### (6) Toni Garcia

Garcia testified that:

She is the children's court-appointed special advocate. The children have been with the same foster parents since the case's beginning. This stability has benefited the children. C.A., in particular, has flourished in the foster parents' care, but L.A. is also thriving. The foster parents spend a lot of time and attention on the children, engage in family activities with them, take them to playgrounds, encourage them to play with each other, and let them engage with other appropriately aged children.

The foster parents intend to adopt C.A. and L.A. if they are available for adoption. They are currently able to meet the children's needs. In Garcia's view, the foster parents "go above and beyond."[3]

Garcia also said that Father's rights should be terminated and that he should have no access to L.A. She cited his "desire to not address his mental health issues," his attempts at suicide or self-harm, his history of domestic violence, and his CPS history with L.S. She also opined that he presents an emotional danger to L.A. based on his relationships with Mother and Ex-wife and on

---

[3] Case worker Davis also testified to the foster home's stability: "The home they are in now is stable. The parents take them to be with other children. They have a normal, stable childhood, a routine that they know what's happening at what particular time of the day. They get up, they go to school, they come home and have dinner. Weekends, they go to see family, they go play."

the threatening behavior he displayed throughout the course of this case. Garcia acknowledged that Father had an appropriate relationship with L.A. during the supervised visits that she observed, but she was concerned that he would be different outside a controlled environment based on his problems and Girlfriend's "active CPS history."

**(7)    Michael Apodaca**

Father called his friend Michael Apodaca as a witness. Apodaca testified that:

He has known Father since 2013. He saw Father act as L.S.'s sole provider for a period of years. He was never concerned that Father was not caring for L.S. properly. Father took care of her, and she was "[v]ery clean and happy." Father has always been able to pay his bills and take care of himself. When Apodaca testified, Father had been working at a welding company for at least five or six months. Based on what he saw of Father and L.S., Apodaca thought Father could adequately care for a child. But he acknowledged that he did not know Father was using methamphetamine, that he had attempted suicide, or that he had been hospitalized.

It was the trial judge's prerogative to assess the weight to give each witness's testimony. *See In re J.D.*, 436 S.W.3d 105, 116 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (trial court as factfinder was free to "decide what weight to give the witnesses' testimony"). The judge could reasonably discount Apodaca's testimony and instead credit the testimony of witnesses who were better acquainted with Father's problems.

**4.    Applying the Law to the Facts**

We next apply the *Holley* factors to the evidence, referring also to the statutory best interest factors as they may be pertinent to this case.

**a.    The Child's Desires**

L.A. was two years old when this case was tried, so she could not express her desires. In any event, a child's preference should not be considered absent a showing of sufficient maturity.

*In re D.W.*, 445 S.W.3d 913, 926 (Tex. App.—Dallas 2014, pet. denied). This factor is not relevant in this case.

> b.    **The Child's Needs and the Parent's Parental Abilities**

These factors are related so we consider them together. *See id.*

The Department presented ample evidence that Father's parental abilities are poor and that he would not be able to meet L.A.'s needs. The evidence permitted the trial court to conclude that:

- Father assaulted Ex-wife in the presence of their two-year-old daughter L.S.

- He tormented L.S. and tried to turn her against Ex-wife by withholding toys from her before Ex-wife's visitation periods.

- L.S. had six urinary tract infections while she was in Father's sole custody.

- Father's behavior with L.S. during supervised visits was inappropriate. He did not exercise his visitation rights with L.S. at all for several months leading up to the trial in this case.

- He frequently threatened to beat one of his children—apparently L.S.—with a belt.

- He once drove away with L.A. without a car seat when she was only a few weeks old.

- He and Mother used methamphetamine together almost every day. On at least one occasion, they used it in a downstairs area of their residence while C.A. and L.A. were upstairs with a monitor.

- C.A. and L.A. were behind on their immunizations, had lice, and were in a state of neglect when removed them from Mother and Father. C.A. was also behind socially.

- C.A. had a strong, terrified reaction to Father when she encountered him after she and L.A. had been removed from his and Mother's care.

- Father failed to pay child support.

- Father had untreated mental health problems.

On the other hand, there was also evidence that Father was appropriate with L.A. during supervised visits and that he had maintained employment for several months leading up to trial.

–27–

Abusive conduct and substance abuse are relevant to a parent's parental abilities and ability to care for a child's needs. *See* FAM. § 263.307(b)(7), (8); *see also In re K.C.*, 219 S.W.3d 924, 927 (Tex. App.—Dallas 2007, no pet.) ("The jury can give 'great weight' to the 'significant factor' of drug-related conduct."). Additionally, untreated mental health problems undermine a parent's parental abilities and his ability to care for a child's emotional and physical needs. *In re A.G.*, No. 05-15-01298-CV, 2016 WL 3225894, at *6–7 (Tex. App.—Dallas June 10, 2016, pet. denied) (mem. op.).

Considering all the relevant evidence, the trial court could reasonably conclude that these factors favored termination as being in L.A.'s best interest.

### c. Danger to the Child

The Department adduced substantial evidence permitting the trial court to conclude that Father presented emotional and physical dangers to L.A. if his parental rights were not terminated. The evidence supported the following facts:

- Father had been a frequent methamphetamine user and was currently in a relationship with Girlfriend, who used methamphetamine shortly before the trial in this case. He also used methamphetamine with Mother while they were supposed to be caring for C.A. and L.A.

- Father committed acts of domestic violence against both Ex-wife and Mother. He assaulted Ex-wife while their two-year-old child was present.

- Father was verbally abusive and frequently threatened people when he came into conflict with them.

- Father has suicidal tendencies and other mental health issues that he has not treated.

A parent's volatility, verbal abuse of service providers, verbal threats of violence, and physical assaults are evidence of future danger to the child. *See, e.g.*, *In re J.L.M.*, No. 01-16-00445-CV, 2016 WL 6754779, at *10 (Tex. App.—Houston [1st Dist.] Nov. 15, 2016, no pet.) (mem. op.); *see also In re J.L.B.*, 349 S.W.3d 836, 849 (Tex. App.—Texarkana 2011, no pet.)

(parent's association with drug user supported conclusion that termination was in children's best interest).

To the extent Father argues that he did not have a positive methamphetamine test after 2016, there was testimony that the sudden disappearance of methamphetamine from his drug tests suggested that the tests might have been manipulated, especially given his different hair treatments that he was instructed against. Regardless, recent improvement alone is not sufficient to avoid termination of parental rights. *In re N.T.*, 474 S.W.3d at 479.

### d.      Programs Available to Assist the Parent

The record indicates that Father did not truly take advantage of the programs and services available to him during the pendency of this case. There was evidence that he did not learn from the BIPP program he completed. His therapist's testimony suggested he did not take her services seriously. Caseworker Davis testified that Father stopped taking his mental health medications, and there was no evidence of any programs that would help him become and stay medication compliant. He did not give a social history, get a psychiatric evaluation, or participate in NA/AA meetings as he was supposed to. He was generally uncooperative with Department personnel and with service providers.

The trial court could reasonably conclude that this factor supported termination. *See* FAM. § 263.307(b)(10) (one best interest factor is "the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision").

### e.      Plans for the Child and Stability of the Home or Proposed Placement

We may consider these factors together. *See In re D.W.*, 445 S.W.3d at 929. There was no evidence that Father had any particular plans for L.A. Girlfriend testified that she and Father were looking for a house to move into when her lease expired (about two months after the trial's

end). Girlfriend also testified that she was about to regain custody of her two sons and that she was involved in litigation over custody over her daughter. As previously mentioned, Girlfriend admitted to being a past methamphetamine addict and to using it shortly before trial. The trial court could have viewed all this evidence as showing that (i) Father's plans for L.A., to the extent he had any, would not serve L.A.'s best interest and (ii) Father would not provide L.A. with a stable home.

There was also evidence that L.A. was thriving with her foster parents and that they wanted to adopt her and C.A. This evidence of the proposed placement also supports the premise that terminating Father's rights would serve L.A.'s best interest.

### f. Parent's Acts and Omissions Showing an Improper Parent–Child Relationship and Any Excuse for Them

We consider the last two *Holley* factors together. *See In re D.W.*, 445 S.W.3d at 930.

Father's drug use with Mother when they were responsible for L.A.'s safety indicated that his parent–child relationship with L.A. was not a proper one. *See In re A.W.*, 444 S.W.3d 690, 698 (Tex. App.—Dallas 2014, pet. denied) (considering drug use under this *Holley* factor). So did his acts of domestic violence against Ex-wife and Mother. Caseworker Davis testified that Father did not use skills he learned in a fatherhood class during his visits with L.A. Ryan testified that Father had missed several visits with L.A. without timely notice or a doctor's note. We see no evidence of any excuses for Father's behavior.

Father asserts in his summary of the argument that the trial court could have protected L.A.'s interests with a remedy less drastic than terminating Father's rights. He suggests that the court could have made the foster parents L.A.'s sole managing conservators but still given him some limited rights, and he points out that Mother will still have limited contact with the children. However, there was evidence that the Department could not place the children with Mother's relatives after removal because Father had threatened those people and knew where they lived.

Furthermore, Ryan testified that the Department had "a huge safety concern" for L.A.'s foster or adoptive parents if Father were to have continued visitation.

Moreover, there was evidence that Father did not exercise his right to supervised visitation with his other daughter, L.S., for several months leading up to the trial in this case.

This evidence supported a conclusion that giving Father continued contact with L.A. was not in her best interest.

### 5. Conclusion

There was ample evidence supporting termination under the *Holley* and statutory best-interest factors. The trial court could reasonably form a firm belief or conviction that terminating Father's parental rights would serve L.A.'s best interest. Accordingly, we hold that the evidence was legally and factually sufficient, and we overrule Father's second issue.

### III. DISPOSITION

Having overruled Father's two issues, we affirm the trial court's judgment.


/Bill Whitehill/
BILL WHITEHILL
JUSTICE


180645F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF C.A. AND L.A., CHILDREN

No. 05-18-00645-CV

On Appeal from the County Court At Law No. 1, Kaufman County, Texas
Trial Court Cause No. 95793-CC.
Opinion delivered by Justice Whitehill.
Justices Francis and Fillmore participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered November 12, 2018.