# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00700-CV

---

**M. L., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 20TH DISTRICT COURT OF MILAM COUNTY
### NO. CV40855, THE HONORABLE JOHN YOUNGBLOOD, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

In this suit involving termination of parental rights, appellant M.L.'s previous counsel filed an *Anders* brief asserting that the appeal is without merit and that there are no arguable grounds for reversal. *See Anders v. California*, 386 U.S. 738, 744–45 (1967); *In re P.M.*, 520 S.W.3d 24, 27 & n.10 (Tex. 2016) (per curiam). After reviewing the record, we determined that at least one arguable ground for reversal existed, abated the appeal, and remanded the case to the trial court for appointment of new counsel for M.L. (Mother). *M.L. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00700-CV, 2023 WL 2603393 (Tex. App.—Austin Mar. 23, 2023, no pet.) (mem. op.); *see In re C.C.*, No. 04-19-00844-CV, 2020 WL 2139307, at *1 (Tex. App.—San Antonio May 6, 2020, no pet.) (mem. op.) (abating appeal and remanding for appointment of new counsel).

Mother's new counsel has filed a brief arguing that there is legally and factually insufficient evidence to support the trial court's findings regarding the two statutory predicate

grounds for termination and the child's best interest, *see* Tex. Fam. Code § 161.001(b)(1)(D) (endangerment through conditions or surroundings), (O) (failure to comply with court order), (2) (best interest), and that Mother was deprived of her rights to due process, to a jury trial, and to effective assistance of counsel. For the following reasons, we reverse the trial court's decree terminating Mother's parental rights to J.J. (Child) and remand this case for further proceedings consistent with this opinion.[1]

## BACKGROUND

The following witnesses testified at the October 14, 2022 bench trial: Department caseworker Lindsay Carver; Mother; and Mrs. Williams,[2] the foster mother. No exhibits were offered or admitted into evidence. Upon the Department's request, the trial court took judicial notice of the Department's emergency-removal affidavit. The substantive portions of the reporter's record total thirty-two pages, two of which involve testimony pertaining solely to Father.

Carver testified, relevantly, that Child was currently about nineteen months old and had been in the same foster home since he was removed from "the home" at about two months of age. Carver had been assigned to the case just a few months before trial and could not recall the facts that necessitated Child's removal except to state that "it was neglectful supervision and physical neglect that we were dealing with."

Carver testified that Child was doing "amazing" in the foster home and that the foster family wants to adopt him. Mother was currently "not in compliance" with the family

---

[1] The parental rights of Child's father (Father) were also terminated, but he did not appeal.

[2] The reporter's record does not indicate Mrs. Williams's first name.

service plan because she had "not finished individual therapy," telling her therapist that she would not be continuing therapy because Child "was going to be adopted." Although Mother had completed other requirements—a psychological evaluation, a parenting class, and a domestic-violence class—Carver believed that Mother "has not shown meaningful change or implementation of any of those things." Carver agreed with the representation of Department counsel that Mother "has mental health problems" but did not specify further. Carver stated that she believed it would be in Child's best interest if Mother's parental rights were terminated but did not provide any further detail or explanation of such statement.

Carver explained that some of "her concerns" with Mother "are her mental health needs." She elaborated: Mother is "very reactive" and "very back and forth about her decision making." Carver testified that Child "is a small child that can not protect himself and I'm concerned that [Mother] is not able to protect him." Her "other concerns" were Mother's "giving up" on therapy because Mother believed it was pointless when Child was simply going to be adopted as well as Mother's failure to make "any change in [her] behavior." Carver described the last in-person visitation that Mother had with Child, in August 2022. After the visit, Mother left the building "screaming," causing Child to cry, and saying that she was going to "break shit in the lobby," seemingly because she was upset that Child did not appear to recognize her. Thereafter the visitations resumed virtually, as they had proceeded previously due to COVID-19. The weekly virtual visitations have been going well since then.

According to Carver, Mother's psychological evaluation indicated a diagnosis of PTSD and that she has a "severe" "overall level of disability," but Carver did not further elaborate on the type of disability. Carver stated that Mother had suffered a stroke several years earlier, which necessitated the amputation of one of her legs. Mother now uses a motorized

3

wheelchair and "has been using a live-in caregiver" to help her take care of herself and her daily needs. Mother uses the bus for transportation because she lacks her own means of transportation.

In her testimony, Mother admitted to sending some "very violent and inappropriate text messages" to the caseworker, including the following: "y'all white bitches love to take from black people. I hope somebody blows up the fucking white bitch." She agreed that throwing "temper tantrums has not helped" her to get the services she needs to obtain the return of Child. Mother testified that she would not react the same way (i.e., engage in "outbursts" and "temper tantrums") should Child do something she doesn't like because she had since learned from her parenting classes about how to communicate with and appropriately discipline a child who misbehaves, including using time outs and taking away toys.

Mother admitted that she had once informed her attorney that she wanted to relinquish her parental rights to Child because her attorney "had violated her rights," but then after talking with her caseworker Mother realized that there had been a "misunderstanding" and confirmed that she did not, in fact, want to relinquish her rights but to "fight" for them. Mother said she had been temporarily influenced by a "fear factor" but that she loves her son and does not want to give up her rights to him.

Mother testified that she is on "five different medications," without specifying which ones or for which conditions, and stated that she takes the medications as prescribed. She acknowledged that her three separate "outbursts" at Department offices concerned the Department. She explained that she stopped attending therapy because she felt that the Department had "given up" on her and had "made up [its] mind" to let Child be adopted, which made her feel hopeless and that there was no point in continuing therapy. Although Mother

4

does not currently have a live-in caregiver, she has a neighbor who lives across the street who helps her with her own care and transportation. She is able to provide for her financial needs through the disability payments and food stamps she receives, and she has family support via her sister. Although Mother continued to have contact with Father at the beginning of the case, she had broken off contact with him since before 2022. Mother explained that she had not seen Child in person much during the case because COVID-19 had required virtual visits for most of the case's duration.

Mrs. Williams testified that Child is healthy and up-to-date on his medical and dental appointments. Child is the "first baby [she has] raised," and Mrs. Williams admittedly "might be a little more concerned than [she] should be" about how Child is doing developmentally. Mrs. Williams believes that Child has always been "a little bit behind on things," but "he gets there," and the caseworker and pediatrician had both told her to "give it more time" and just "keep an eye on it," specifically his verbal abilities and pointing to items that he wants. In general, "everything else" is going well, and Child is eating foods and interacting with the foster family.

After the close of evidence, Mother informed the court that she "ha[d] something to say."[3] The court replied that "we are really beyond that point but [would] give [her] the opportunity to say what [she has] to say." Mother then stated that she wanted to represent herself and fire her attorney. The court informed her that the "hearing is all but over" and the court had "already ruled" to terminate her parental rights.

---

[3] Earlier in the trial, towards the end of Carter's (the first witness) testimony, Mother stated, "Judge, I have something to say," to which the court responded, "Hang on, ma'am, we will get to you."

## STANDARD OF REVIEW

"Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). Parental rights have been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20.

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1) and (2) that termination is in the child's best interest. Tex. Fam. Code § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *E.N.C.*, 384 S.W.3d at 802.

"Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child," a trial court "cannot involuntarily sever that relationship absent evidence sufficient to 'produce in the mind of the trier

6

of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *A.C.*, 560 S.W.3d at 630 (quoting Tex. Fam. Code § 101.007; *Holick*, 685 S.W.2d at 20). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *Id.*

"A correspondingly searching standard of appellate review is an essential procedural adjunct." *Id.* "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id.* "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* We are also mindful that we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of the witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

## DISCUSSION

Because it is dispositive, we begin by addressing Mother's third issue, in which she challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of her parental rights is in Child's best interest. *See* Tex. Fam. Code

7

§ 161.001(b)(2). We review a factfinder's best-interest finding in light of the non-exhaustive list of considerations set out in *Holley v. Adams*, which include the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the child by the parties seeking custody, the stability of the proposed placement, the parent's acts or omissions indicating that the parent–child relationship is improper, and any excuses for the parent's conduct. 544 S.W.2d 367, 371–72 (Tex. 1976); *see A.C.*, 560 S.W.3d at 631; *E.N.C.*, 384 S.W.3d at 807; *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *C.H.*, 89 S.W.3d at 27. "We must consider 'the totality of the circumstances in light of the *Holley* factors' to determine whether sufficient evidence supports" the best-interest finding. *In re J.M.G.*, 608 S.W.3d 51, 54 (Tex. App.—San Antonio 2020, pet. denied) (quoting *In re B.F.*, No. 02-07-00334-CV, 2008 WL 902790, at *11 (Tex. App.—Fort Worth Apr. 3, 2008, no pet.) (mem. op.)).

The "best interest" parental termination factor is "child-centered and focuses on the child's well-being, safety, and development." *A.C.*, 560 S.W.3d at 631. It is strongly presumed that the child's best interest is served by maintaining the parent–child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Because of this presumption in favor of maintaining the parent–child relationship and the due-process implications of terminating a parent's rights to her minor child without clear and convincing

evidence, "the best interest standard does not permit termination merely because . . . a child might be better off living elsewhere." *In re J.G.S.*, 574 S.W.3d 101, 121–22 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (internal citations omitted). In other words, termination cannot be used merely to reallocate children to better and more prosperous parents. *Id.* In addition, the Department's burden is not simply to prove that a parent should not have custody of her children; it must meet the heightened burden to prove, by clear and convincing evidence, that the parent should *no longer have any relationship* with her child whatsoever. *In re K.N.J.*, 583 S.W.3d 813, 827 (Tex. App.—San Antonio 2019, no pet.); *see also In re J.A.J.*, 243 S.W.3d 611, 616–17 (Tex. 2007) (distinguishing conservatorship from termination).

The record contains scant evidence of most of the *Holley* factors. While undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in a child's best interest, in general the "presence of scant evidence relevant to each factor will not support such a finding." *In re A.W.*, 444 S.W.3d 690, 693 (Tex. App.—Dallas 2014, pet. denied). Further, "a lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

As for the first factor, Child was too young to express his desires. Although conclusory testimony showed that he was doing "amazing" in the foster home, undisputed testimony showed that Mother's regular, weekly virtual visitations with Child had also been "going well." Child had spent minimal time with Mother due to the very young age at which he was removed from her care, but no evidence was presented that his removal was due to any shortcoming, action, or failure of Mother.[4] The foster mother testified that she was monitoring

---

[4] Although the trial court took judicial notice of the emergency-removal affidavit, the court was not permitted thereby to take judicial notice of the truth of any of the affidavit's factual allegations. *See C.S. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-17-00229-CV,

9

Child's development and that he was interacting with the foster family. This scant evidence pertaining to the first factor is neutral at best. As for the second factor, there was no evidence that Child had any unusual or special emotional or physical needs or would require greater-than-average future care. Although the foster mother thought that he might be experiencing some developmental delays, the record did not indicate that such possible delays would require caretaking beyond Mother's abilities or would not resolve on their own. This scant evidence of the second factor is also neutral at best.

The third factor considers whether the parent poses any present or future physical or emotional danger to the child. While past endangering conduct often predicts future endangerment, *see Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue."), there was no evidence that Mother had previously endangered Child. Evidence was presented of Mother's violent and reactive text and oral communications with the caseworker and "outbursts" and "temper tantrums" at Department offices, one of which occurred in Child's presence and caused him to cry. This constitutes some evidence from which a factfinder could infer possible future physical or emotional danger to Child should Mother feel stressed or overburdened by caring for Child or herself, especially considering her physical and (undefined) mental disabilities. This factor weighs slightly in favor of termination. As for the fourth factor, Mother admitted that such "outburst" behaviors were inappropriate, and she exhibited some positive parenting abilities by describing knowledge and skills she has since acquired from taking parenting classes, explaining how she would appropriately discipline

---

2017 WL 3471072, at *3 (Tex. App.—Austin Aug. 9, 2017, no pet.) (mem. op.). Further, although Carver conclusorily testified that, regarding Child's removal from the home, "it was neglectful supervision and physical neglect that we were dealing with," she does not identify a subject for the statement (i.e., Was it Father's, Mother's, or both parents' neglect?) or support the conclusion with any facts.

Child should she become frustrated with him in the future. As for the parental abilities of Mrs. Williams, the child was "doing amazing" in her home, eating well, and interacting with the foster family, and Mrs. Williams was monitoring his development. This factor is neutral or weighs slightly in favor of termination.

Regarding the fifth, sixth, and seventh factors, Mother identified neighbors and family members who could assist her with her self-care and with transportation and explained that she is able to meet her financial needs, including paying her rent, through the disability payments and food stamps she receives. No evidence showed that Mother's housing or finances were unstable, and she testified that she takes her medications as prescribed. The evidence was undisputed that Mother availed herself of the Department's services and completed all her court-ordered requirements except for individual therapy. Mother testified that she "gave up" individual therapy after she believed the Department had "made a decision" to put Child up for adoption because she felt hopeless about obtaining his return. Although Child was "doing amazing" in the foster home, and the foster mother was monitoring his developmental progress, the foster mother also had no experience raising a baby. Mother testified that she believed the emotional and mental bond between a biological mother and her child is very important, and she was concerned about how Child might be harmed if that bond were severed. These three factors are neutral at best or weigh slightly against termination. Apart from what was already discussed about Mother's "tantrums" and "outbursts," no evidence showed any acts or omissions indicating that the parent–child relationship is improper (the eighth factor) and the related last factor regarding excuses for any improper parental conduct.

Bearing in mind the presumption in favor of maintaining the parent–child relationship, and that the best-interest standard does not permit termination merely because a

11

child might be better off living elsewhere, *see J.G.S.*, 574 S.W.3d at 121–22, we conclude that the evidence pertaining to most of the *Holley* factors does not rise to legally sufficient evidence to support the trial court's finding that termination of Mother's parental rights is in Child's best interest. The only evidence weighing in favor of termination was Child's "doing amazing" in the foster home and Mother's inappropriate text communications with the caseworker and few "outbursts" at Department offices, which on one instance caused Child to cry. Even viewing such evidence in the light most favorable to the trial court's finding, and disregarding the evidence that a factfinder could reasonably have found to be not credible—such as Mother's representation that she would more appropriately handle stressful situations and parenting challenges in the future—we nonetheless cannot conclude that the evidence is such as to permit a reasonable factfinder to form a firm belief or conviction that termination of Mother's parental rights is in Child's best interest. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Because the Department's burden was not simply to prove that Mother should not have custody of Child but that clear and convincing evidence proved that she should no longer have any relationship with Child whatsoever, *see K.N.J.*, 583 S.W.3d at 827, we sustain Mother's third issue and hold that the trial court erred in finding that termination of Mother's parental rights was in Child's best interest.[5]

## CONCLUSION

Having sustained Mother's challenge to the legal sufficiency of the evidence to support the trial court's best-interest finding, we reverse the trial court's decree terminating

---

[5] Because the evidence was not legally sufficient to support the trial court's best-interest finding, we need not reach Mother's remaining issues. *See* Tex. R. App. P. 47.1; Tex. Fam. Code § 161.001(b) (prescribing that to terminate parental rights, trial court must find *both* that termination is in child's best interest and that parent's actions satisfied a ground described in Subsection (b)(1)).

12

Mother's parental rights to Child. Ordinarily, when we hold that the evidence is legally insufficient to support a finding on which a party bore the burden of proof, we render judgment that the party take nothing on its claim that depended on securing that finding. *See* Tex. R. App. P. 43.3. However, in cases involving involuntary termination of parental rights, if the trial court does not order termination of the parent–child relationship, Section 161.205 of the Family Code requires that the trial court either (1) deny the petition for termination or (2) render any order in the best interest of the child. *See* Tex. Fam. Code § 161.205. Because appellate courts are "not in a position to determine whether to simply deny the petition for termination or render some other order in the best interest of the child," *Van Heerden v. Van Heerden*, 321 S.W.3d 869, 874–75 (Tex. App.—Houston [14th Dist.] 2010, no pet.), we remand the case to the trial court for the limited purpose of rendering an order consistent with Section 161.205. *See In re M.F.R.G.*, No. 13-21-00023-CV, 2021 WL 2149827, at *8 (Tex. App.—Corpus Christi–Edinburg May 27, 2021, no pet.) (mem. op.).

_____
Thomas J. Baker, Justice

Before Justices Baker, Smith, and Jones[*]

Reversed and Remanded

Filed:  August 24, 2023

[*]Before J. Woodfin Jones, Chief Justice (Retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code § 74.003(b).